[S. F. No. 14392. In Bank.—November 25, 1931.]

GOLDEN GATE BRIDGE AND HIGHWAY DISTRICT (a Public Corporation), Petitioner, v. W. W. FELT, Jr., as Secretary, etc., Respondent.

George H. Harlan, W. H. Orrick, Sullivan, Roche, Johnson & Barry and Orrick, Palmer & Dahlquist for Petitioner.

Thelen & Marrin for Respondent.

John J. O'Toole, City Attorney of San Francisco, Allen G. Wright, W. B. Mathews, Everett W. Mattoon, County Counsel of Los Angeles County, J. H. O'Connor, Assistant County Counsel of Los Angeles County, Warren Olney, Jr., J. M. Mannon, Jr., A. Crawford Greene and James D. Adams, *Amici Curiae.*

LANGDON, J.—This is a petition for a writ of mandate, to compel respondent, as secretary of the board of directors of Golden Gate Bridge and Highway District, to sign certain bonds proposed to be issued by said district. Respondent justifies his refusal by the claim that the bonds are invalid. A brief review of the history of the district is necessary for an understanding of the questions raised by this proceeding.

In 1923 the legislature enacted a statute, the purpose of which is thus expressed in its title: "An act to provide for the incorporation and management of bridge and highway districts and to provide for the acquisition and construction by said districts of highways, bridges and approaches thereto, and for the acquisition of all property necessary therefor, and also to provide for the issuance and payment of bonds by said districts, for the levying of taxes and the collection of tolls by said districts and for the annexation of additional territory thereto." (Stats. 1923, chap. 228, p. 452.) The act was amended in 1925 (Stats. 1925, chap. 387, p. 714), in 1927 (Stats. 1927, chap. 344, p. 574), and in 1931 (Stats. 1931, chap. 169, p. 239). Under it, the principal steps in the organization of a bridge and highway district are as follows: The boards of supervisors in the counties in which organization is contemplated determine whether to organize, either by calling elections and securing a popular vote, or by adopting ordinances consenting to such organization, which ordinances are subject to referendum. Thereafter petitions for the formation of the district must be signed by qualified electors of each county and within the boundaries of the district, equal to at least ten per cent of the number who voted in the last election for Governor. These petitions are filed with the Secretary of State, who publishes them for three weeks, together with a notice stating the period in which protests by

property owners against inclusion of property within the district will be heard. Such protests are heard by the superior court of the county in which the protesting taxpayer resides, and the court is given power to exclude any lands from the proposed district. Its decision may be reviewed by this court.

In 1925, after the enactment of this statute, an interested group applied to the boards of supervisors of the counties of Del Norte, Humboldt, Mendocino, Lake, Napa, Sonoma, Marin, and the city and county of San Francisco, to pass uniform ordinances as provided in the act. No such action was taken in Humboldt and Lake Counties, but the other six adopted the ordinances. Thereafter petitions were signed by the required number of voters in these counties and notice was published by the Secretary of State. Protests were filed by property owners in all of the included counties except Del Norte. These were heard in the superior court, and in December, 1928, judgments were entered. These judgments determined that the whole of the counties of Del Norte, Sonoma, Marin, and the city and county of San Francisco would be benefited by the formation of the district. The court excluded a large portion of the county of Mendocino, and a small portion of the county of Napa. The court further determined that the county of Del Norte was properly included in the district notwithstanding the fact that it was not contiguous to the remaining territory, basing this part of its decision on the 1925 amendments to the statute permitting the inclusion of noncontiguous territory. On December 4, 1928, the Secretary of State issued his certificate of incorporation of the district, and notified the boards of supervisors of these counties to appoint members of the board of directors, as required by the act. This was done, and the board then met and commenced its duties, levying and collecting taxes in the district at various times for its expenses. On August 27, 1930, it adopted plans and specifications, engineering and financial, for the construction of a bridge across the Golden Gate between San Francisco and Marin County, which was the object of its organization. By another resolution an election was called to vote upon the proposition of incurring a bonded indebtedness of $35,000,000. After due notice, the election was held on November 4, 1930, in all parts

of the district, and the proposition was carried. Subsequently, on June 17, 1931, the board by resolution provided for the issuance of bonds in the principal amount of $35,000,000, and for the sale of $6,000,000 worth, to draw four and three-fourths per cent interest per annum, payable semi-annually. The said bonds were ordered to be dated July 1, 1931, and to be signed by the president and secretary of the board. Notice of their intended sale was published, and a bid was received and accepted. The board then demanded that respondent sign them. Upon his refusal to do so, this proceeding was commenced.

It should be noted that the legislature in 1931 enacted a validating statute (Stats. 1931, chap. 70) as an urgency measure, which confirmed the incorporation of any such district as of the date of issuance of its certificate of incorporation, and declared valid the boundaries of the district, whether contiguous or noncontiguous. It also ratified the appointment of the members of the board, and all of their proceedings, including those taken for the issuance of bonds.

Prior litigation has determined certain issues involved herein. A writ of mandate was issued by this court compelling the Secretary of State to publish the notice required by the act upon the filing of the petitions. (*Doyle* v. *Jordan*, 200 Cal. 170 [252 Pac. 577].) Upon review in this court at the instance of protesting property owners in the counties of Mendocino, Sonoma, Napa, and the city and county of San Francisco, the judgments of the superior court with respect to the inclusion of land within the district were affirmed. (*Wheatley* v. *Superior Court*, 207 Cal. 722 [279 Pac. 989], and memorandum decisions in *Dempster* v. *Superior Court*, 207 Cal. 795 [279 Pac. 991] , *Esaisa* v. *Superior Court*, 207 Cal. 796 [279 Pac. 992] , and *Crawford* v. *Superior Court*, 207 Cal. 797 [279 Pac. 992].) An appeal was taken to the United States Supreme Court, and an application was made for a writ of *certiorari*. The appeal was dismissed and the writ denied. (*Crawford* v. *Superior Court*, 281 U. S. 692 [74 L. Ed. 1121, 50 Sup. Ct. Rep. 238].) As a result of these decisions, it is now settled that the proceedings taken in the formation of the district sufficiently complied with the Constitution and statutes of this state, and that such proceedings did not conflict with any right under the federal Constitution.

The present proceeding involves only the validity of the proposed bonds and the power of the district to levy taxes in payment of the interest and principal thereof. These matters were expressly reserved in the prior decisions above mentioned. The attack upon the bonds made by respondent and by *amici curiae* rests upon a number of grounds, which may be briefly noted under the following heads: (1) The power of an appointive board to tax; (2) the alleged lack of provision for equalization of property values; (3) the insufficiency of the petitions of the electors in the city and county of San Francisco; (4) inequalities arising from the boundaries of the district; (5) the applicability of the statutory changes in 1931. Before considering any of these points, however, it is necessary to decide whether this proceeding is one of which this court may take jurisdiction, for the purpose of determining them. It is contended by *amici curiae*, representing certain taxpayers not parties herein, that the proceeding is fundamentally collusive in its nature by reason of the fact that there is in reality no controversy between petitioner and respondent. These *amici curiae* have filed and argued a motion to dismiss the petition. It is to this motion that we first address ourselves.

■ Preliminarily it may be observed that to grant this motion would be to prevent a speedy determination of the validity of the proposed bonds, and hence to delay the commencement of the project, perhaps for years. Such a result should be avoided if it is reasonably possible to do so. The value of the proposed bridge is statewide; when constructed, it will become an integral part of the Redwood Highway, linking the northern and southern parts of the state with one continuous modern avenue for traffic, and also a part of the state highway entering two neighboring states. The board of directors has completed its plans, has already entered into exceptionally favorable contracts for construction, and has solicited bids for its bonds. All such bids, however, have been conditioned upon a judicial determination of their validity. The legislature itself has, in enacting the 1931 amendments to the statute and the validating act, declared the urgency of prompt action, both to relieve congested traffic and to furnish work for a large number of people now unemployed. ■ This court cannot

lightly thrust aside a proceeding so important to the welfare of the citizens of the state. In our opinion, a controversy is presented of which we have jurisdiction.

■ It is conceded that respondent secretary is personally desirous of a decision in favor of petitioner. In other words, this is a friendly suit. It appears that the bridge district agreed to reimburse respondent for the expense incurred by him in the litigation, in the event that the contractors or the bidders for the bonds or other persons interested did not do so. It likewise appears, however, that the bidders for the bonds have agreed with respondent to secure payment of the expenses of the litigation incurred by him and that there is no agreement with such bidders and the district for reimbursement from the district for such expenses. These facts, amici curiae assert, show that the proceeding is fictitious and collusive, being a mere attempt to secure an advisory opinion without an actual contest. They further contend that the validity of the bonds is not even an issue in the case, for the reason that respondent, an employee of the board, is bound to sign them regardless of his opinions, and that he may be discharged for his refusal to do so. The real controversy, they claim, is between the district and taxpayers who are not parties to the suit.

Neither on principle nor authority does this position commend itself to us. ■ It is, of course, the prevailing doctrine in our judicial system that an action not founded upon an actual controversy between the parties to it, and brought for the purpose of securing a determination of a point of law, is collusive and will not be entertained; and the same is true of a suit the sole object of which is to settle rights of third persons who are not parties. (*Haley* v. *Eureka County Bank*, 21 Nev. 127 [12 L. R. A. 815, 26 Pac. 64].) That is not the situation here. Respondent, though an employee of the board and serving at its pleasure, is a public official, holding office pursuant to the provision made by the statute, and bound by oath to support the Constitution and laws of this state. His signature on the bonds is required by the statute. The bonds which he refused to sign recite that "provision has been made by law for the levy and collection of a direct annual tax upon all taxable property within said district sufficient to pay the

principal and interest of this bond''. He contends that the legislative provisions giving such power to tax are unconstitutional, and that the recital is therefore incorrect. This same opinion has been expressed by many persons, including lawyers of repute. It was also raised in the prior litigation involving this district, and was by this court expressly left undecided. (*Doyle* v. *Jordan, supra; Wheatley* v. *Superior Court, supra.*) If respondent's contention is sound, and he were forced to sign, he would be acting in violation of his public duty, and assisting in the deception of prospective purchasers of the bonds. He is not bound to take a step which might conceivably involve a personal liability on his part in the event of a subsequent judicial declaration of unconstitutionality of the act, or falsity of the recitals in the bonds. (*Brandenstein* v. *Hoke,* 101 Cal. 131 [35 Pac. 562]; *Denman* v. *Broderick,* 111 Cal. 96 [43 Pac. 516]; *Hopkins* v. *Clemson Agr. College,* 211 U. S. 636 [35 L. R. A. (N. S.) 243, 55 L. Ed. 890, 31 Sup. Ct. Rep, 654]; see discussion in Field, Unconstitutional Statutes and Public Officers, 77 Univ. Pa. L. Rev. 155; Raspacz, Officers Acting Under Void Statutes, 11 Minn. L. Rev. 585; Crocker, Liability of Public Officers, 2 So. Cal. L. Rev. 236.)

■ Though a ministerial officer, he may nevertheless refuse to sign an instrument believed by him to be invalid. (*City of North Sacramento* v. *Irwin,* 94 Cal. App. 652 [271 Pac. 788, 272 Pac. 767]; *State* v. *Dolley,* 82 Kan. 533 [108 Pac. 846].) Nor is the fact that he is removable at the pleasure of the board material, for his successor would be in exactly the same position. A genuine controversy existed, therefore, between petitioner and respondent as to matters vitally affecting the duties and perhaps the liabilities of the latter. Able counsel were retained to present the case for respondent to this court, and it is not suggested that they were lacking in diligence or good faith in their preparation of the case. Under these circumstances this court can properly consider the petition and adjudicate the issues raised therein. We said in *Price* v. *Sixth District Agr. Assn.,* 201 Cal. 502, 516 [258 Pac. 387, 393]: ''It may well have been that the mayor of the City and the chairman of the board of supervisors would have liked to see this public improvement carried out; nevertheless, it is a fact found by the court and warranted by the evidence that

these officers doubted the validity of the contract and the power of the City and County to enter into it. It is also true that reputable counsel of high standing representing the interested parties denied the validity of the contract and the power of the City and County to enter into it and the interests financing the construction of the improvement refused to proceed until validity had been determined. The litigation was thereupon fought in good faith with fairness and earnestness . . . and upon such a showing the conclusion must be that the court's implied finding that collusion was absent is supported." In *Floersheim* v. *Board of Commrs.*, 28 N. M. 330 [212 Pac. 451, 453], referred to in the foregoing decision, the court pointed out that there is nothing improper in a friendly suit by a party who, though attacking the validity of bonds, is hopeful that they will be upheld: "The personal desires of the parties as to the result of the litigation are of no moment, provided no fraud or collusion is resorted to." (See, also, *State* v. *Dolley*, 82 Kan. 533 [108 Pac. 846] ; *W. E. Bowen Imp. Co.* v. *Van Hafften*, 209 Mo. App. 629 [238 S. W. 147] ; *Parker* v. *State*, 132 Ind. 419 [31 N. E. 1114] ; *Ex parte Steele*, 162 Fed. 594; *Cone* v. *Gilmore*, 79 Or. 349 [155 Pac. 192] ; *McCoy* v. *Carren*, 179 Ky. 590 [201 S. W. 463].)

This court has over a long period of years taken jurisdiction in many proceedings substantially similar to the instant case; that is to say, it has, on petition for writ of mandate, determined the validity of the bonds or contracts of a public corporation. A few of the more recent cases are *Los Angeles County Flood Control Dist.* v. *Wright*, 213 Cal. 335 [2 Pac. (2d) 168] ; *California Toll Bridge Authority* v. *Wentworth*, 212 Cal. 298 [298 Pac. 485] ; *City of Pasadena* v. *Chamberlain*, 204 Cal. 653 [269 Pac. 630] ; *Slavich* v. *Hamilton*, 201 Cal. 299 [257 Pac. 60] ; *City of Long Beach* v. *Lisenby*, 175 Cal. 575 [166 Pac. 333] ; *La Mesa etc. Irr. Dist.* v. *Halley*, 197 Cal. 50 [239 Pac. 719] ; *Montecito County etc. Dist.* v. *Doulton*, 193 Cal. 398 [224 Pac. 747] ; *Los Angeles County etc. Dist.* v. *Hamilton*, 177 Cal. 119 [169 Pac. 1028]. Several earlier decisions have been cited by *amici curiae* which might appear, to some extent, in conflict with this array of authority. In *City of Los Angeles* v. *Lelande*, 157 Cal. 30 [106 Pac. 218], mandate was sought to require the city clerk to certify that

an ordinance was *duly passed,* and he based his refusal on the claim that it was *illegal.* The court, in a brief opinion, denied the petition. In *County of Orange* v. *Backs,* 77 Cal. App. 744 [247 Pac. 519], a similar case, involving the duty of a county clerk to attest an ordinance calling an election to determine whether bonds should be issued, he refused on the ground of the illegality of the bonds if they should be voted. In *Marin Municipal Water Dist.* v. *Dolge,* 172 Cal. 725 [158 Pac. 187], the proceeding was to compel the auditor of the district to countersign certain bonds, and the court said that there was no statutory necessity that he do so, the requirement being established by the mere direction of its board of directors. It is contended by petitioner that there are important differences between the instant case and those just discussed, in that the signature of respondent is a statutory requirement, and such signature attests not the due passage of an ordinance, but the obligation of the bond itself. Irrespective of such differences, however, the cases are contrary to the uniform course of decision pursued by this court in granting writs of *mandamus,* and any language in them which might suggest that it is always the duty of a ministerial officer to act according to the direction of his superiors irrespective of his own views as to the validity of such action, must be considered *dictum,* and disapproved by later decisions.

Amici curiae were invited by petitioner and by this court to bring their clients into this proceeding by intervention, a procedure which has been heretofore permitted by this court (*Wright* v. *Jordan,* 192 Cal. 704 [221 Pac. 915]), provided that the issues raised were relevant. (*La Mesa etc. Irr. Dist.* v. *Halley,* 195 Cal. 739 [235 Pac. 999].) Opportunity was also offered them, whether they intervened or not, to present to the court as fully as they might deem desirable, their objections to the proposed bond issue. Their refusal to intervene was chiefly based upon what we consider to be a wholly untenable ground, namely, that it might jeopardize their right of appeal to the United States Supreme Court. We need not enter into a discussion of this or the other grounds for such refusal, since the only bearing it has on the motion to dismiss is in relation to the claim of collusive action between petitioner and respondent. It surely cannot be said that this proceeding was brought to

reach a collusive determination of the rights of such third parties, when they were urged to come into court and present their own views of the case.

We are satisfied that this court may properly determine the issues hereinbefore mentioned, and that our determination will have the usual force and effect of a final judgment on those issues. (*Price* v. *Sixth Dist. Agr. Assn., supra.*) The motion to dismiss is therefore denied, and we come now to a consideration of the merits of the controversy.

■ The first objection made by respondent is that the Bridge and Highway District Act violates article XI, section 12, of the California Constitution, in providing for the *appointment* of the board of directors of petitioner by the boards of supervisors of the counties. The said section is as follows: "The legislature shall have no power to impose taxes upon counties, cities, towns or other public or municipal corporations, or upon the inhabitants or property thereof, for county, city, town, or other municipal purposes, but may, by general law, vest in the *corporate authorities* thereof the power to assess and collect taxes for such purposes." Respondent contends that to come within the meaning of "corporate authorities", such board must be *elected* by the electors of the district. Preliminarily, it may be noted that this contention is grounded mainly upon the notion of an "inherent right" of local self-government, which is contrary to the great weight of authority, and cannot be said to have been adopted in this state. (See *Johnson* v. *San Diego,* 109 Cal. 468 [30 L. R. A. 178, 42 Pac. 249]; *Booten* v. *Pinson,* 77 W. Va. 412 [L. R. A. 1917A, 1244, 89 S. E. 985]; *Lillard* v. *Melton,* 103 S. C. 10 [87 S. E. 421]; *Trenton* v. *New Jersey,* 262 U. S. 182 [29 A. L. R. 1471, 67 L. Ed. 937, 43 Sup. Ct. Rep. 534]; *State* v. *Williams,* 68 Conn. 131 [48 L. R. A. 465, 35 Atl. 24, 421]; 6 R. C. L. 23; 12 C. J. 754; 1 Dillon, Municipal Corporations, 5th ed., 154; McBain, Right of Local Self-Government, 16 Columb. L. Rev. 190, 299.) Furthermore, such a contention takes no account of the manifest assent of the voters expressed in their passage of the ordinances and their favorable vote at the bond election. But considering the language of the Constitution, we think the suggested interpretation is unsound, and is, in fact, inconsistent with other provisions. Thus, article XI, section 5, provides for the

*election or appointment* of county, township and municipal officers; and article XX, section 4, declares generally that all officers whose election or appointment is not provided for elsewhere in the Constitution, and *all officers whose offices or duties may hereafter be created by law,* "shall be elected by the people, or appointed, as the legislature may direct". For a discussion of the interpretation of similar constitutional provisions, see *Milheim* v. *Moffatt Tunnel Imp. Dist.,* 72 Colo. 268 [211 Pac. 649]; *State* v. *Edwards,* 38 Mont. 250 [99 Pac. 940]; *State* v. *Cooney,* 70 Mont. 355 [225 Pac. 1007].

Irrespective of this interpretation of "corporate authorities", the objection must fall by reason of the prior decisions of this court to the effect that the section is limited to taxes for local "municipal purposes" and has no application to the taxing power of a district organized for a state purpose. That the development of the highway system of the state is a state purpose is obvious, and it has been so declared. (*Matter of Schuler,* 167 Cal. 282 [Ann. Cas. 1915C, 706, 139 Pac. 685].) In *Wheatley* v. *Superior Court, supra,* at page 726, we pointed out that the petitioner was a *quasi*-municipal corporation, substantially similar to "a municipal water district, a public utility district, a municipal utility district and a metropolitan water district". The effect of this holding as to its nature, coupled with the fact that it has a state purpose, is to take it out of the above-mentioned constitutional limitation, and to bring it within the rule that the legislature has the power to provide for taxation by appointive boards in such districts. (*Stuckenbruck* v. *Board of Supervisors,* 193 Cal. 506 [225 Pac. 857]; *City of Pasadena* v. *Chamberlain,* 204 Cal. 653 [269 Pac. 630]; *Henshaw* v. *Foster,* 176 Cal. 507 [169 Pac. 82]; *Pixley* v. *Saunders,* 168 Cal. 152 [141 Pac. 815].)

The second objection of respondent is that the act is unconstitutional in failing to make definite provision for equalization of property values and the ascertainment of tax rates. The argument is that under the statute the tax rate must be fixed in July; that the county boards of supervisors sit as boards of equalization in July, and the state board of equalization sits in August; and that therefore the rate must be fixed prior to the determination

of the property values. Although it has been declared that there is no constitutional necessity that equalization precede the fixing of the tax rate (*People* v. *Latham*, 52 Cal. 598), section 14 of the act does not require the construction given it by respondent. It reads, in part, as follows: "The Board of Directors shall in the month of July of each year determine the amount necessary to be raised by taxation, and shall fix a rate of taxes to be levied which. will raise the amount of money required by the district. . . . " This section clearly requires that the *estimate* of necessary funds be made in July, but it specifies no particular time for the fixing of the tax rate. The board may do so at any time so long as it certifies the rate to the boards of supervisors of the respective counties "within a reasonable time previous to the time when boards of supervisors are required by law to fix their tax rates". The further suggestion that no adequate provision for equalization exists is equally untenable. Section 14 requires the board to certify the rates to the boards of supervisors of each county "with a direction that at the time and in the manner required by law for the levying of taxes for county purposes such board of supervisors shall levy and collect a tax. . . . " It is plain that this method involves the usual process of valuation by county boards of supervisors and by the state board of equalization. (California Constitution, art. XIII, sec. 9; Pol. Code, sec. 3692.) It must be presumed that such boards will properly perform the duties imposed upon them by the Constitution and the general law.

Another contention made by respondent and also by *amici curiae* is that the city and county of San Francisco was never properly made a part of the district. By some curious mischance, only 13,094 signatures of electors were obtained on the petition, and the total number of votes cast for Governor in the general election was 132,225. These facts appeared on the face of the petition. Nevertheless, this irregularity can no longer be urged. The previous litigation involving the district had as its object the determination of the validity of its formation and the inclusion of territory within its boundaries. The decisions in *Doyle* v. *Jordan* and *Wheatley* v. *Superior Court, supra,* are conclusive on all points which were raised or could have

been raised therein. (*Price* v. *Sixth Dist. Agr. Assn.*, 201 Cal. 502 [258 Pac. 387]; *Floersheim* v. *Board of Commrs.*, 28 N. M. 330 [212 Pac. 451]; *Davis* v. *Willis*, 19 N. D. 209 [124 N. W. 706].) The passage of the validating act, moreover, removes all possible doubt as to this result. Section 1 of that act expressly confirms the organization of the district. (Stats. 1931, chap. 70, p. 77.) The defect under consideration was a failure to comply with the terms of the prior statute; there was no violation of the Constitution. In such case, the legislature has power, by the enactment of a curative statute, to declare that the nonobservance of any of the requirements of the former act shall not be subject to further inquiry. (*Marr* v. *Southern Cal. Gas Co.*, 198 Cal. 278 [245 Pac. 178]; *Watkinson* v. *Vaughn*, 182 Cal. 55 [186 Pac. 753]; *Los Angeles County Flood Control Dist.* v. *Hamilton*, 177 Cal. 119 [169 Pac. 1028]; *Imperial Land Co.* v. *Imperial Irr. Dist.*, 173 Cal. 660 [161 Pac. 113]; *Wood* v. *County of Calaveras*, 164 Cal. 398 [129 Pac. 283]; *Chase* v. *Trout*, 146 Cal. 350 [80 Pac. 81].) ▇ The assertion that this validating act is special legislation is without foundation. It is general in its terms, and though it applies only to this one district which has already been organized, it is nevertheless the rule that the constitutional inhibition does not apply. (*San Pedro etc. R. R. Co.* v. *Hamilton*, 161 Cal. 610 [37 L. R. A. (N. S.) 686, 119 Pac 1073].)

▇ Another objection of respondent and *amici curiae* which is urged with some force is that the boundaries of the district are fixed so arbitrarily as to constitute a denial of equal protection of the laws. The particular ground for this contention is the inclusion of Del Norte County, noncontiguous with the rest of the district, and separated from the remainder by Humboldt County, which did not come in. The provision for the inclusion of noncontiguous territory was, as hereinbefore mentioned, part of the amendments of 1925. The possibility of one county which receives benefit from the project refusing to pass the ordinance was in the contemplation of the organizers of the district and was known to all of the boards of supervisors when they passed the ordinances; and the present boundaries of the district, embracing noncontiguous territory, were likewise known to the electors when they voted in favor of the

bond issue. In addition, taxpayers had the right to seek a referendum upon the passage of any ordinance, and the right to protest to the superior court against the inclusion of any of their lands. Finally, in the prior cases before this court, they had the opportunity to raise this point, and, in fact, it was raised and thoroughly argued. The decisions of this court in *Doyle* v. *Jordan* and *Wheatley* v. *Superior Court, supra,* are conclusive on the validity of the organization of the district. In short, the point urged now by respondent, and by *amici curae* on behalf of certain taxpayers not parties herein, could have been presented in the regular manner provided by the act and within the three months' period specified therein from the date of issuance of the certificate of incorporation (see *Miller & Lux* v. *Secara,* 193 Cal. 755 [227 Pac. 171]), and was actually presented by other taxpayers and decided adversely to their claims. The decisions are final, and the matter is *res judicata* at this time. (*Price* v. *Sixth Dist. Agr. Assn., supra; Farncomb* v. *City and County of Denver,* 252 U. S. 7 [64 L. Ed. 424, 40 Sup. Ct. Rep. 271].)

■ It is argued, however, that the refusal of this court in the Doyle and Wheatley cases to determine the power to tax leaves open the question of the validity of the boundaries, in so far as the taxing power is concerned. In order to lay at rest any doubt as to this point, therefore, we now hold expressly that the power of taxation given to the district with its present boundaries does not violate the constitutional guaranty of equal protection. It is not an assessment district, where the tax must be levied in accordance with benefits actually received by the individual taxpayer. It is, as we declared in the Wheatley case and as hereinbefore repeated in this opinion, a *quasi-municipal* corporation. As such, its tax "is not a tax or assessment on property directly benefited by the construction of some local improvement, but is a general tax levied just as, and for the same purpose that any general municipal tax is imposed for carrying on the governmental functions and utilitarian objects of duly incorporated cities or towns". (*In re Orosi Public Utility Dist.,* 196 Cal. 43, 58 [235 Pac. 1004, 1010].) ■ The inclusion of noncontiguous land in such a district is not a ground for constitutional attack. Nor is it a valid objection that other land which

receives equal benefit is not included or for some other reason is not subject to tax. As the court said in *Randolph* v. *County of Stanislaus*, 44 Cal. App. 322, 330 [186 Pac. 625, 628], "It is a matter of common knowledge that in the state of California municipal corporations are not often contiguous, but are separated by intervening territory, and if the formation of districts composed of two or more municipal corporations is to be confined to municipal corporations that are adjacent to each other, then very few public utility districts composed entirely of municipal corporations can be formed in the state of California." (See, also, *People* v. *Town of Loyalton*, 147 Cal. 774 [82 Pac. 620].)

There remains finally the problem of the amendments to the statute enacted in 1931, by which changes were made in sections 14 and 21. It is most vigorously contended by respondent and by *amici curiae* that these amendments, enacted after the bond election, make such a substantial change in the conditions of the authorization of the bonds as to invalidate them if they are issued under the act as amended. The argument, directed mainly at the changes in section 21, is to the effect that the original act provided for the issuance of certain bonds upon a vote of the electors; that prior to completion of the project the principal and interest of such bonds were payable only from proceeds of the sale of the bonds; and that no tax could be levied unless and until the bridge was completed. In its present form section 21 plainly authorizes a tax prior to such completion, and in effect it places the taxing power of the district behind the bonds by permitting either principal or interest to be raised by taxation where necessary. Hence, if the interpretation of the original act urged by respondent and *amici curiae* is correct, a basic change was made.

Petitioner's answer is twofold. First, it is stated that the original act, though somewhat uncertain in its details, conferred the general power of taxation for its bonds upon the district and that the amendments of 1931 clarified its provisions and were merely procedural in character. After a careful study of the original act, we have reached the same conclusion. Section 21, prior to 1931, read in part as follows:

"If the revenues of the district are, or in the judgment of the board of directors, will probably be inadequate for any cause to pay the principal or interest on any bonded debt of the district, as it becomes due, the board of directors must cause a tax to be levied as herein provided sufficient to provide for such deficit and to pay the amount of such principal and interest as the same becomes due, except that until the operation of the works of the district has commenced, and the same commenced to yield a revenue, the interest on the bonded debt shall be paid out of the principal obtained from the sale of the bonds, and after the operation of its works no taxes shall be levied except for deficits, either actually incurred or estimated for the fiscal year in which the same are levied. . . . "

The statutory direction is clear up to a certain point: Until the bridge is built and revenues are received, interest on the bonds is to be paid out of the proceeds of the sale of the bonds. The language used contains the assumption that until the bridge is built and money is earned, there will be sufficient funds derived from the sale of the bonds to meet the interest payments. But as to the procedure in the event of a lack of such funds, section 21 is silent. And that is all that can be said in support of the position of respondent and *amici curiae*. Section 21 was drafted with no express provision for that particular contingency. It does not state that interest shall be payable *only, solely,* or *exclusively* out of the designated fund; nor does it say that it shall not be paid at all until the bridge is in operation. The indication of a preferential fund from which interest is to be paid cannot be deemed to imply a repudiation of the obligation to pay interest save in the manner indicated. (*Avery* v. *Job,* 25 Or. 512 [36 Pac. 293] ; *United States* v. *Fort Scott,* 99 U. S. 152 [25 L. Ed. 348] ; *United States* v. *County Court,* 96 U. S. 211 [24 L. Ed. 628] ; *Norris* v. *Montezuma Valley Irr. Dist.,* 248 Fed. 369.)

Considering the situation as to the *principal* of the bonds, the objection is even less impressive. The clause which reads "except that until the operation of the works of the district has commenced" applies only to *interest*. The preceding provision, covering "principal or interest", permits the levy of taxes if the revenues of the district are, "or in the judgment of the board of directors, *will probably be*

inadequate". The power to tax for the principal of the bonds is directly given by this section, without any qualification at all; and the same is true of the power to tax for the interest, unless the power as to interest is destroyed by the subsequent clause. It would be most unreasonable for the legislature to provide that the district could, by taxes, meet the binding obligation of the principal of the bonds, and could never by such method meet the equally binding obligation of the interest. The unreasonableness of such an interpretation is further apparent if the first and second parts of the section are compared. The first part declares the right to tax for principal *or interest*. Can it be assumed that the legislature in one sentence intended both to give and to take away that power? Such a result cannot be conceded unless the language leaves no alternative. In fact, it does leave an alternative which is both obvious and reasonable. The qualifying clause as to interest does not destroy the power to tax, given by the preceding language; it merely restricts that power. It prevents any tax for interest in pursuance of the previously granted power to levy such tax as long as there are funds available from the proceeds of the sale of the bonds. We are convinced that this was the legislative intention and that it is reasonably deducible from the language of the section. We are aware of the doctrine of "strict construction" of tax statutes, but to say that such a statute must be strictly constructed does not mean that it is to be given an unnatural construction to defeat the tax. It should be construed reasonably. (*Riley v. Havens,* 193 Cal. 432 [225 Pac. 275]; *Estate of Parrott,* 199 Cal. 107 [248 Pac. 248]; see 2 Cooley on Taxation, 4th ed., 1123.)

We have thus far confined ourselves to section 21, but an examination of other parts of the original act fully confirms our conclusion. Considered as a whole, the act made the bonds a binding obligation of the district. Section 8 gives such a district the power "to borrow money, incur indebtedness and to issue bonds or other evidence of such indebtedness". Section 15 provides for the calling of an election when it is deemed necessary to incur a "bonded indebtedness". Section 17 provides that any bonds issued by it are "legal investments for savings banks", and they are given "the same force and value and use as bonds issued by

any municipality. If the district is not obligated to pay either principal or interest save from revenues, its bonds cannot be an "indebtedness" of the district; and it would be in the highest degree absurd to make them legal investments for savings banks unless the district stood behind them. But if they have the force, value and use of municipal bonds, they are, like municipal bonds, general obligations in payment of which taxes can be levied. Finally, section 10 specifically provides that such a district shall have power "to cause taxes to be levied for the purpose of paying running expenses, the organization expenses and the investigation expenses of the district before the issuance of bonds, and after the issuance of bonds to cause taxes to be levied for the purpose of paying any obligation of the district. . . . " This language is certainly broad enough to authorize taxes to pay the obligation of the district incurred through the issuance of bonds.

 Upon the theory that the act at least was ambiguous in its provisions prior to 1931, *amici curiae* advance the further contention that the ambiguity was resolved by the district against the taxing power by reason of the publication of a 110-page report of the chief engineer on the general plan of the project, which contained the brief declaration that "taxes may be levied only for preliminary expenses", "or to cover deficiencies of revenue after construction has been completed". It seems too plain for argument that this statement, part of a lengthy report on other subjects, cannot be deemed to be an official interpretation by the district of the legal effect of the act. In any event, it has no efficacy when in conflict with the law itself. The proposition as it appeared on the ballot was more accurately expressed. It specified that "interest shall be paid" out of proceeds, and did not use the word "only". It also stated that the proposition was to "incur a bonded indebtedness". Although this point goes only to the good faith of the district and not to the validity of the bonds, still it may not be amiss to express our view that the voters were not deceived by the report, the ballot or the original act. They believed that proceeds from the sale of bonds and revenues from the operation of the bridge would be resorted to for the payment of interest and principal before any tax would be levied, and in this belief they were of course correct. They

were, however, presumed to be familiar with the statute
(*Los Angeles County Flood Control Dist.* v. *Wright,* 213 Cal.
335 [2 Pac. (2d) 168]; *Inglewood* v. *County of Los Angeles,*
207 Cal. 697 [280 Pac. 360]), and they certainly knew that
a costly project was to be built and financed by bonds selling
at par with a low rate of interest. All of these factors tend
to indicate full knowledge on their part that the bonds were
to be general obligations of the district, supported by the
power of taxation.

█ The other changes made by the 1931 amendments
require only brief mention. Section 14 was amended to pro-
vide that running expense of the district during the period
of construction was to be deemed part of the cost of con-
struction and could be paid out of proceeds of the sale of
the bonds. This places no extra burden on taxpayers since
it contemplates no tax; and, as a matter of fact, the ex-
penses of the district during that period may reasonably be
said to be part of the cost of construction, since the district
has no other purpose than the construction of the bridge.
Section 21 provides for the creation of certain funds for
reserve interest, operating expenses, repairs and depreciation,
and a sinking fund. If the board may validly collect money
for its statutory purposes, it may segregate the funds so
collected for these purposes, and doubtless would have had
such power without express statutory provision. Section
21 further authorizes the board to borrow money in anticipa-
tion of taxes, to meet deficits in payment of principal or in-
terest of bonds. The original act gave express power to
borrow money for all proper purposes of the district. (Sec.
10, subd. 8.) Another amendment to section 21 changes
the method of distribution of surplus revenues, by deducting
certain sums for previous deficits, operating expenses for
the next six months and reserve interest, before dividing it
among the counties of the district. Plainly, the use of such
surplus partially to reduce the ultimate obligation of the
district cannot injure taxpayers. Finally, section 21 as
amended permits interest to be paid out of proceeds of the
sale of bonds until six months after the board's estimate of
the period of completion of the work, instead of until com-
pletion, as previously specified. The purpose of this is to
guard against default in the payment of interest by reason
of inability of the district to secure the necessary funds im-

mediately upon completion, either by revenues or taxes. No injury to taxpayers can result from this provision.

Our conclusion, already stated, is that the amendments of 1931 were of a procedural character, and made no substantial change in the obligations of the taxpayers. It is therefore unnecessary to consider the contention of petitioner that even substantial changes might be validly made by the legislature after a bond election, where, as here, there is no constitutional requirement of an election. Nor is it necessary to dwell upon the contention that as a matter of construction the amendments should not be applied retroactively to the bonds authorized at the election of November 4, 1930. The legislative intention is unmistakable; the amending act is declared to be an urgency measure, and was obviously designed to facilitate the issuance of bonds by petitioner, the only district as yet organized under the statute. The further contention of *amici curiae* that such a retroactive interpretation would result in a lack of uniformity under article I, section 11, of the California Constitution, is equally untenable. The statute as amended applies uniformly to all bridge and highway districts and to all bonds to be issued by them.

There being no merit in any of the objections to the issuance of the proposed bonds, it is the duty of respondent to sign them as directed by petitioner. It is therefore ordered that the writ of mandate issue.

Richards, J., Seawell, J., Curtis, J., Shenk, J., and Waste, C. J., concurred.

PRESTON, J., Dissenting—I dissent.

Not so much from the conclusion as from the reasoning of the main opinion that assumes to make applicable to this bond issue the so-called 1931 amendments to the act and also from the further reasoning employed to hold that the judgment in this action is *res judicata* on the question of the power to tax the property of the district to retire the indebtedness.

I would have no objection to a holding of the court in this action that it is the plain duty of the respondent to attest these bonds, if the above-mentioned propositions were eliminated as grounds for the conclusion. In other words, the re-

spondent, as an official, may properly question the validity of the organization of the district and the regularity of the bond election and any subsequent proceedings pursuant to the act up to the point of issuance of the bonds, but no further, for it must not be overlooked that the express intent and tenor of the legislature under which petitioner is organized is to retire the bonds issued from the revenues received from the operation of the bridge and not from taxation; hence the question of taxation may never arise. The power to tax comes into being only upon the happening of a certain event. Or to put it still another way: The bonds are regularly issued whether the power to tax the property of the district for their payment is conditional or absolute; therefore, the opinion, in my judgment, makes a gratuitous excursion into fields beyond the scope represented by respondent.

This dissent need not be extended and I shall confine my discussion to the following propositions: (1) Power to tax property of the district involves serious state and federal questions which cannot be settled by determination of the issues in this proceeding and moreover as a matter of policy should not be attempted. (2) The 1931 amendments to the act import radical and revolutionary alterations in the liability of the taxpayers of the district, to their detriment, and the said amendments should be held inapplicable to the bond election already held. These questions will be considered in the order named.

This is a *mandamus* proceeding by the district against its own secretary to compel him to subscribe or attest the bond issue. Numerous taxpayers have been allowed to appear as *amici curiae* to urge that grave legal questions are involved and that respondent cannot and does not represent them as to such issues and, moreover, as to them, this court is entirely without jurisdiction. I see no reason why respondent, even though personally interested adversely to the taxpayers, may not officially represent them in all matters germane to the issues made by the pleadings but this is far from authorizing the determination of questions outside these issues.

The act of 1923, as amended in 1925, contained sections 20 and 21 which read as follows: Section 20 (Stats. 1923, p. 463). "The board of directors shall require the general manager to furnish an estimate of the rates necessary to

pay the obligations of the district, and upon the recommendation of the general manager, or such modifications thereof as they may adopt, shall fix such rate as will pay the operating expenses of the district, provide for repairs and depreciation of works, owned or operated by it, pay the interest on any bonded debt, and so far as possible, provide a sinking or other fund for the payment of the principal of such debt, as it may become due, it being the intention of this act to require the district to pay the interest and principal of its bonded debt from the revenues of the district.''

Section 21 (Stats. 1925, p. 720, sec. 4). ''If the revenues of the district are, or in the judgment of the board of directors, will probably be inadequate for any cause to pay the principal or interest on any bonded debt of the district, as it becomes due, the board of directors must cause a tax to be levied as herein provided sufficient to provide for such deficit and to pay the amount of such principal and interest as the same becomes due, except that until the operation of the works of the district has commenced, and the same commenced to yield a revenue, the interest on the bonded debt shall be paid out of the principal obtained from the sale of the bonds, and after the operation of its works no taxes shall be levied except for deficits, either actually incurred or estimated for the fiscal year in which the same are levied. If from any cause the revenues of the district shall be more than adequate to pay all of the expenses of the district for the current year any surplus shall be divided by the directors of the district, and apportioned to the respective counties within the district in the proportion which the assessed value of property within such county, city and county or parts of counties within the district bears to the total assessed value of property within the district.''

It can thus be seen that the bonds voted by the taxpayers of this district rest primarily upon the revenues from the operation of the improvements. The power of taxation is conditional; it may be exercised only to supply a deficit in the revenues and this only an anticipated deficit for the current fiscal year. Liability is thus made secondary and indemnatory and not primary. If the revenues are sufficient (and the board has power to make them such) the question of taxation will not arise. In refusing to sign, respondent, therefore, is ''borrowing trouble'' and antici-

pating events which the act contemplates that the board, by a fixation of proper tolls, shall prevent. For example, in the Statutes of 1929, chapter 763, pages 1492, 1494, sections 5 and 8, are found provisions authorizing a bond issue to span San Francisco Bay resting solely upon the revenues to be derived from the operation of the improvement; the right to tax nowhere exists, yet the bonds may issue for that project. It may even be conceded that as a legally organized district, the abstract right to tax is involved in the issues represented by respondent. But this, if true, is far from saying that respondent represents the issue as to when taxation under this particular act may be had.

The doctrine of *Price* v. *Sixth District*, 201 Cal. 502 [258 Pac. 387], must not be perverted and extended to issues not properly included in the pleadings as made or in the issue as determined. The issue held determined in that case related simply to the validity of a certain contract and the power and authority of the public officers involved to execute it. The holding in that case does not foreclose inquiry into questions that were not a necessary ingredient of the issue determined. The issue as to when the power to tax arises and the conditions under which such power may be exercised are not necessarily involved in the validity of the district or the regularity of the proceedings leading up to the bond issue. In other words, the power of taxation may or may not come into being upon the happening of certain eventualities and such a contingency is no necessary part of the issue between the district and respondent. That the issue of taxation has not been foreclosed by any previous decision of this court has twice been expressly held. See *Doyle* v. *Jordan,* 200 Cal. 170, 190, 191 [252 Pac. 577], and *Wheatley* v. *Superior Court,* 207 Cal. 722, 726 [279 Pac. 989, 991], where the court in reviewing the Doyle case says:

" . . . It is urged that the act under consideration presents certain unconstitutional features with reference to its provisions for taxation, and we are asked to decide that question here. We think such a problem is not presented at this time. In the case of *Doyle* v. *Jordan, supra,* it is expressly stated that, regardless of the validity of the taxing provisions of the act, the district, when formed, may become a valid and constitutional agency of the state and that if the directors thereof have been given any unlawful powers, in

a proper proceeding, when they attempt to exercise them, such exercise will be controlled or prevented by the courts. As in the case of *Doyle* v. *Jordan, supra,* we are herein concerned only with the proceedings incorporating the district.''

It may not be said that respondent is interested in the validity or invalidity in the recital on the face of the proposed bonds, as follows: '' . . . that provision has been made by law for the levy and collection of a direct annual tax upon all taxable property within said District sufficient to pay the principal and interest of this bond''. This is at most but a mere conclusion of law; it is not a recital of fact as was the case in *Municipal Imp. Co.* v. *Thompson,* 201 Cal. 629 [258 Pac. 955]. If the power to tax exists, it exists regardless of the statement on the face of the instrument; if the power to tax does not exist, no recital in the bond can confer it.

But aside from the contention that a foreign issue is injected into this case, we may at once see from a glance at a map of the district that when the question of taxation arises, if it does arise, state and federal questions of a serious nature will be presented by reason of the omission from the boundaries of the district of large areas which as a matter of judicial knowledge may be seen to be equally if not more benefited than some of the areas included within the district. Del Norte County, for example, is probably more than one hundred miles distant from the nearest boundary of the contiguous area comprising the body of the district. It requires no resort to evidence but is clear from facts of which this court may take judicial knowledge that the property owners of Humboldt, a large and prosperous county of the state, and Lake County, lying between the separated areas of the district, are equally if not more benefited than the property owners of numerous areas within the district such as, for example, said Del Norte County and Mendocino County. That such discrimination raises the questions of due process of law and equal protection of the law has been repeatedly held by the Supreme Court of the United States. As said in *Memphis & Charleston Ry.* v. *Pace,* 282 U. S. 241, 246 [75 L. Ed. 315, 51 Sup. Ct. Rep. 108, 110]:

"But, however the tax may be laid, if it be palpably arbitrary, and therefore a plain abuse of power, it falls within the condemnation of the due process clause, *Houck* v. *Little*

*River District, supra; Valley Farms Co.* v. *Westchester, supra;* and if it be manifestly and unreasonably discriminatory it falls within the condemnation of the equal protection clause. *Gast Realty Co.* v. *Schneider Granite Co.,* 240 U. S. 55 [60 L. Ed. 1239, 36 Sup. Ct. Rep. 400]; *Kansas City Southern Ry. Co.* v. *Road Improvement Dist. No. 6,* 256 U. S. 658 [65 L. Ed. 1151, 41 Sup. Ct. Rep. 604]; *Thomas* v. *Kansas City Southern Ry. Co.,* 261 U. S. 481 [67 L. Ed. 758, 43 Sup. Ct. Rep. 440]; *Road Improvement District No. 1* v. *Missouri Pacific R. R. Co.,* 274 U. S. 188 [71 L. Ed. 992, 47 Sup. Ct. Rep. 563]."

In *Milwee* v. *Tribble,* 139 Ark. 574 [214 S. W. 56, 57], the court said: "The act is unconstitutional and void because, as shown by the allegations of the complaint, it contains an entire section 'which is situated at a distance of five miles from the remaining lands described in the act of constituting the body of the district', and excludes, or rather does not include, the lands intervening. . . . It is impossible that the lands in section 18, and the other lands five miles distant, constituting the main body of the district, would be benefited, while the intervening lands receive no benefit whatever. The act, therefore, upon its face shows an arbitrary discrimination between the landowners, who necessarily derive benefit from the improvement. . . . "

It is no answer to this contention to say that the taxpayers are estopped to raise the question of the power of taxation by reason of the recent bond election. In the first place, this is begging the question because the taxpayers may have and doubtless did believe that a direct tax would never be levied. I say this because the record contains a printed report of the chief engineer, which presumably was widely circulated among the voters and which contained in bold type these words: "Taxes may be levied only . . . to cover deficiencies of revenue after construction has been completed." Indeed, the above language is almost a direct quotation from section 21 of the act itself which states "no taxes shall be levied except for deficits".

Nor can it be said that the taxpayers are estopped because the act provides a method by which a hearing may be had as to whether their lands will or will not be benefited by the improvement, for the act nowhere provides that they may have any of their lands excluded upon the ground that

lands outside the district were arbitrarily excluded therefrom. The act is wholly lacking in conferring power to extend this kind of relief. This grotesque situation can be logically emphasized by supposing that the district were composed of Marin, San Francisco and Del Norte Counties only, omitting therefrom Sonoma, Mendocino, Lake and Humboldt Counties. Could it then be said that there was no discrimination or arbitrary action by reason of the omission of all these intervening territories from the district? This, under the procedure authorized by the act, might well happen. It is too clear for controversy that the district is a legalized anomaly and when it comes to the point of attempting to place a tax upon the property of the district as constituted, serious and far-reaching questions, both under the state and federal Constitutions, will arise. It is putting this court in an awkward predicament to anticipate these questions and to attempt in a friendly suit between the district and its secretary, to force upon the taxpayers of the district, a liability about which they have had no opportunity to be heard and over which the court in fact has no jurisdiction.

The handling in the main opinion of the question of the effect of the 1931 amendments to the act under which the district was formed and the bonds voted is even more open to question than is the other position disclosed by the above discussion. We have already noted that under section 20 of the act, the express intent of the legislature was "to require the district to pay the interest and principal of its bonded debt from the revenues of the district" and that the revenues only were to be resorted to for operating expenses, repairs, depreciation, sinking funds, etc.; that under no circumstances was taxation to be resorted to except to pay items of principal and interest for the current fiscal year where the revenues had become or might become insufficient. This fact, which lies at the foundation of the proper interpretation of the whole act, is entirely omitted from discussion in the main opinion. That the bonds shall be retired from the revenues and the tolls shall be fixed to accomplish this purpose, is the keystone of the entire scheme for bridging the Golden Gate. Only a tax for deficiencies in revenue may be allowed under the act and this conforms to the decision of the district itself at the time when, with the provisions of sections 20 and 21 in mind, it

stated that taxes would be levied only for deficiencies. The plain meaning of these sections is that after the bridge is built and opened to traffic, tolls fixed and revenues begin to come in, if a deficit as to principal and interest on the bonds exists or is foreseen for the current fiscal year, then and then only may a tax be levied and that only to relieve the then present deficit. In furtherance of this requirement, accruing interest prior to construction and operation must be paid from the proceeds of sale of the bonds. In other words, on this bond issue taxpayers may rest secure from tax until construction of the bridge and its operation and they may then be taxed only respecting the bonds for yearly deficits in revenue which the district is charged with the duty of preventing by the levy of sufficient tariff rates. The liability of the taxpayers is that of a guarantor and not that of a maker of an obligation. The main opinion undertakes to divorce section 21 of the original act from section 20, which it ignores, and thereby assumes ground upon which to indulge a strained, artificial and in fact absurd construction, a construction that petitioner even shows a lack of faith in.

Now come the amendments of 1931, and what do they provide? In short, they relegate revenue from the operation of the bridge to a minor place in the scheme and make the obligation of the taxpayers primary—not only after construction of the bridge but before as well. In other words, the liability of the bondholders is not to provide a fund that shall build and put in operation a bridge where tolls are the primary source of revenue but the responsibility for the bridge, its construction and perhaps for a new bond issue are all lifted from the bondholders and shifted to the shoulders of the taxpayers. What will a taxpayer think when he realizes what has been done? What will future electors think when they come to vote at a bond election, reflecting that in the Golden Gate Bridge and Highway District the voters asked "for bread" and "received a stone"? By this legislation characterized as an amendment to section 21, through circumlocution, by retroactive interpretation and by the free use of assumption and innuendos, the conditional liability of the taxpayers is made an absolute and primary one.

It extends the time of payment of interest from the proceeds of the bond sales to a period of six months beyond

the estimated period of completion of the structure. This the taxpayers could hardly object to. But with this concession as an allurement, comes the next provision that in July of the contemplated year of completion and pending this estimated period, if delay is forecast, a tax shall be levied to pay one year's interest on the bonds. ˙ This is a plain alteration of the contract between the taxpayers and the district under the former section to the effect that no tax should be levied for anything except deficits and this only after the completion of the bridge and the operation thereof. The amendment then sets up four funds. (Stats. 1931, p. 242): 1. To pay operating expenses of the district; 2. To provide for repairs and depreciation of the works; 3. To pay the interest of such bonds as it becomes due, and 4. To provide a sinking or other fund, etc., and a provision for· borrowing money upon the faith of the revenues and taxes. Then follows the astounding change that in July of each year (whether the bridge is built or not or whether a new bond issue becomes necessary or not) each of the above funds shall be supplied and replenished. In other words, if the bridge is not built and, of course, no revenues come in, yet these funds are to be supplied and kept supplied from taxation. Can the most credulous and unwary not see that this plan alters radically and revolutionarily the liability imposed by the former section? There no tax except for deficits as to principal and interest after construction and operation existed and for these items only as to the current year. Here exists primary tax liability before construction and operation, which is another way of saying that regardless of construction or operation, a tax may be imposed not alone for current deficits in principal and interest but for operating expenses, repair, depreciation, repayment of sums borrowed and lastly, for the maintenance of a sinking fund for the liquidation of· the bonded debt. To say that these and similar changes which I shall not stop to enumerate are not high-handed alterations in the obligation assumed by the voters is simply to obliterate plain facts by judicial fiat. Yes, it is tantamount to a complete disregard of the will of the voters and will have a paralyzing effect on all bond elections hereafter where this doctrine is known. A taxpayer would be standing in his own light to cast any

other ballot than "no" on any bond issue of a public corporation.

Petitioner, half admitting the justice of the strictures I have made, replies that the legislature has power to override the will of the voters and issue bonds upon any conditions it sees fit. In other words, that the propositions upon which the taxpayers voted need not be respected but may be changed at liberty. To put it more bluntly, the taxpayers may be deceived into pledging their assets to a given proposition by their ballots and afterward the legislature may radically alter that proposition to mean anything it likes and the taxpayers are powerless to secure relief therefrom. · To state this proposition is to demonstrate its lack of force as well as its manifest injustice. The cases cited below are direct authority that, the vote being sufficient, a bond election creates an obligation in the nature of a contract that must be respected and a material departure from the proposition as voted will not be upheld. (*Skinner* v. *City of Santa Rosa*, 107 Cal. 464, 465 [29 L. R. A. 512, 40 Pac. 742]; *Peery* v. *City of Los Angeles*, 187 Cal. 753 [19 A. L. R. 1044, 203 Pac. 992].) See, also, *O'Farrell* v. *County of Sonoma*, 189 Cal. 343, 348 [208 Pac. 117, 119], where the court said: "The order calling the election and the ratification of that order by the electors constituted a contract between the state and the individuals whose property was thereby affected. (*Peery* v. *City of Los Angeles*, 187 Cal. 753 [19 A. L. R. 1044, 203 Pac. 992].) After the contract had been made it could not be altered by one of the parties, only, but by all of the parties thereto. When by its order, duly accepted by the vote of the electors, the length of the road had been specifically defined, its terminals specifically located, and the cost of the whole established—these elements became a part of the contract. As to them the board, acting alone, could not redivide the contract. Neither could it directly expend the moneys on only a portion of the road. What it could not do directly it could not do indirectly. Such fact is of the utmost importance to the interested parties."

In *David* v. *Timon*, 183 S. W. 88, 92, a Texas Civil Appeals case, we have an exact parallel in principle with the situation before us. There the voters supported a proposition to float a bond issue upon similar terms. The legislature

undertook to alter the terms and conditions upon which the bonds were issued. This was held to be in violation of the Constitution of the state of Texas which provided that "no bill of attainder . . . or any other law impairing the obligation of contracts, shall be made". In that connection the court said: "The bonds must be issued and sold according to the very terms of the submission of the matter to the voters, and no material departure from the terms can be tolerated."

The doctrine announced in the cases relied upon by petitioner is not in point, typical of which is *La Mesa etc. Irr. Dist.* v. *Halley,* 197 Cal. 50, 61, 62 [239 Pac. 719, 723]. Such cases as the above do no more than hold that the legislature may change the terms and conditions upon which the district was organized, the relation between the taxpayer and the district not being of contract. But this does not reach the situation here where the assets of the taxpayer are pledged to an obligation, thus bringing into operation the relation of parties to a contract. This is pointed out by the following language from the La Mesa case: "The respondents herein, however, make the contention that this court in the recent case of *Peery* v. *City of Los Angeles* (187 Cal. 753 [19 A. L. R. 1044, 203 Pac. 992]), has approved in its broadest application the doctrine which the respondents insist was declared in that decision; but an examination of the later case will disclose that the doctrine that the legislature may not change the law governing the issue and terms of disposition of bonds by cities was given application to a condition wherein certain bonds of the City of Los Angeles had already been voted and issued prior to the making of a change in the law permitting such bonds to be disposed of below par in contravention of the terms of the law in existence at the time of the election, whereby the electors voted to issue and sell the bonds of the city at par and not otherwise. It is clear that no such question is presented in the instant case, and nothing said therein can be interpreted as warranting the application of the doctrine applicable to the particular facts of the earlier case to the situation presented in the case at bar."

I deplore the action of the court in this case. It opens us to the criticism that we are transcending our just province and making a decision as a pure expediency. The bonds which were not readily salable when voted, have by

the act of the legislature been changed without the consent of the voters for the purpose of making them merchantable and we are indorsing that kind of procedure. The legislature has not only attempted to impair the obligation of a contract but in effect has itself levied a tax for municipal purposes in violation of article XI, section 12, of the Constitution, which provides: ''The Legislature shall have no power to impose taxes upon counties . . . for county . . . or other municipal purposes, but may, by general laws, vest in the corporate authorities thereof the power to assess and collect taxes for such purposes.''

Progress in public improvements is laudable, but such progress should not be made at the expense of justice and fair dealing. The conclusion in this case undertakes to saddle upon the taxpayers an obligation which they did not assume and doubtless would not have assumed. The doctrine of the main opinion is not only unsound but dangerous and far-reaching and I withhold my signature from it.

Rehearing denied.

Preston, J., dissented.