[L. A. Nos. 7112, 7113. In Bank.—January 13, 1922.]

HERBERT PEERY, Appellant, v. THE CITY OF LOS ANGELES (a Municipal Corporation), et al., Defendants and Respondents; HARRY W. ANDERSON, Intervener and Appellant.

[L. A. No. 7124. In Bank.—January 13, 1922.]

HARRY W. ANDERSON, Appellant, v. THE CITY OF LOS ANGELES (a Municipal Corporation), et al., Defendants and Respondents.

[1] MUNICIPAL CORPORATIONS — LOS ANGELES — BONDS ISSUED UNDER ACT OF 1901—SALE BELOW PAR.—Under section 2, subdivision 29, of the charter of the city of Los Angeles, providing that in the creation of a bonded indebtedness the general laws of the state shall be followed, and under section 6 of the act of 1901 (Stats. 1901, p. 29), providing that bonds voted and issued thereunder shall be sold for not less than their par value, the city is without power to sell such bonds for less than par so as to enable them

187 Cal.—48

to bear six per cent instead of four and one-half per cent in-
terest as provided in the ordinance calling the election.

[2] ID.—PROHIBITION OF SALE BELOW PAR—ORDINANCE CALLING ELEC-
TION—STATEMENT UNNECESSARY.—The fact that the provision of
the act of 1901 forbidding the sale of municipal bonds voted and
issued under its procedure for less than their par value is not to
be found in that portion of the statute prescribing what shall
be contained in the proposition to be submitted to the voters for
their approval does not affect the prohibition, since it is not
essential, unless expressly made so, that all of the terms and con-
ditions of the statute under which a bond election is to be held
shall be set forth in the ordinances calling such election or de-
tailed upon the ballot.

[3] ID.—SALE OF UNSOLD BONDS BELOW PAR—ACT OF 1921—LACK OF
AUTHORITY.—An attempted sale by the city of Los Angeles of
unsold bonds issued and voted under the act of 1901 for less than
their par value in order to enable them to bear a greater rate of
interest than provided in the ordinances calling the bond election
is void, notwithstanding the act of 1921 (Stats. 1921, p. 844)
providing for the sale of unsold bonds by municipalities at a price
which will net the purchaser not more than the equivalent of six
per cent per annum.

[4] ID.—SALE OF BONDS UNDER ACT OF 1921—FRAUD UPON ELECTORS
—CONTRACTUAL RELATIONSHIP.—Where the city of Los Angeles
voted a bonded indebtedness under the act of 1901, a status
analogous to a contractual relation was created between the elec-
tors and the officials of the municipality, and the relation could
not be changed by the sale of the bonds in the manner provided
by the act of 1921, without working, in effect, a fraud upon the
electors.

APPEALS from a judgment of the Superior Court of
Los Angeles County.  J. P. Wood, Judge.  Reversed.

The facts are stated in the opinion of the court.

Emmet H. Wilson for Plaintiff and Appellant in L. A.
Nos. 7112 and 7113.

Ingle Carpenter and Dana R. Weller for Intervener and
Appellant in L. A. Nos. 7112 and 7113 and for Appellant
in L. A. No. 7124.

Jess E. Stephens, City Attorney, W. B. Mathews, Ray C.
Eberhard and Trent G. Anderson for Respondents in L. A.
Nos. 7112, 7113 and 7124.

RICHARDS, J., *pro tem.*—In these two cases there are three appeals: One by Herbert Peery and one by H. W. Anderson, plaintiff and intervener, respectively, in the first of said actions, and one by H. W. Anderson as plaintiff in the second of said actions. The same questions are presented upon each of said appeals. These actions were each instituted for the purpose of obtaining an injunction against the defendant city of Los Angeles and its officials, restraining it and them from disposing of certain municipal bonds of said city for less than the par value thereof, or upon terms which would yield to the purchaser thereof a rate of interest in excess of the rate specified in the ordinances calling the respective elections held in said city for the purpose of securing the approval of its electors for the incurring of the indebtedness to be evidenced by said bond issues; and, also, for the purpose of having declared void a certain contract between said city and one I. H. Hellman, relative to the purchase of a certain portion of said bonds. As to the facts in each of these cases there is no dispute.

In the year 1914 the city of Los Angeles duly and regularly adopted certain ordinances providing for and calling a special election within said city for the purpose of submitting to the qualified voters thereof the proposition of incurring a bonded indebtedness in the sum of six million five hundred thousand dollars, for the purpose of acquiring and constructing certain works for supplying the city and its inhabitants with electricity for heat, light, and power. It was provided in said ordinances that the maximum rate of interest to be paid upon said indebtedness was four and one-half per cent per annum, payable semi-annually, which rate, it was specifically provided, should not be exceeded in the issuance of bonds for said indebtedness. The election provided for in said ordinances was duly held on the eighth day of May, 1914, and resulted in a vote of more than two-thirds of the electors voting at said election approving the incurring of said indebtedness and the issuance of said bonds. Thereafter, at intervals, several issues of portions of said bonds were duly authorized and made, aggregating in all a total of four million four hundred and forty-six thousand dollars, leaving the balance of said bonds, amounting in their face value to two million and fifty-four thousand dollars, undisposed of at the time of the institution of these

actions. The complaints in these actions allege, with rela-
tion to the said portion of said bonds remaining undisposed
of, that the city of Los Angeles, through its said officials,
are negotiating for the sale of said remaining portion of
said bonds, and are intending and threatening to sell the
same for less than the par value thereof, and upon terms
which will net to the purchaser an amount of interest more
than the equivalent of six per cent per annum, payable
semi-annually on the par value of said bonds.

During the month of May, 1919, the city of Los Angeles
duly passed and adopted another set of ordinances providing
for the incurring of a further bonded indebtedness in the
sum of thirteen million five hundred thousand dollars for
the purpose of the construction of certain other works for
the further supply of electric light, heat, and power to said
city and the inhabitants, and also for the acquisition of a
certain electric distributing system owned by the Southern
California Edison Company, situate within said city, and for
the calling and holding of a special election within said city
for the purpose of securing the approval of the electors
therof for such bonded indebtedness. In the ordinances pro-
viding for the calling of said election it was expressly
provided that the maximum rate of interest to be paid on
said indebtedness was five per cent per annum, payable
semi-annually, which rate should not be exceeded in the
issuance of bonds for the said indebtedness. The election
provided for in said ordinances was duly held on the third
day of June, 1919, and resulted in a vote of more than two-
thirds of the electors of said city voting at said election
approving the incurring of said indebtedness and the issuance
of said bonds. The entire amount of said bond issue yet
remains unsold. The complaints in each of these actions
allege that on or about the first day of August, 1921, I. H.
Hellman made the city council of said city of Los Angeles
a proposal in writing whereby he offered to purchase the
entire issue of the aforesaid bonds for the sum of eleven
million nine hundred and sixty-five thousand dollars and
accruèd interest to the date of delivery; that on the
second day of August, 1921, the said city council of said
city passed and adopted a resolution accepting said pro-
posal, and now intends and threatens to sell and issue
said bonds in accordance therewith, and for less than the

par value thereof, and upon terms which will yield to the purchaser a rate of interest in excess of five per cent per annum upon the par value of said bonds. These actions were accordingly instituted for the purpose of restraining the consummation of the sale of any part of the unsold portion of either of these bond issues for less than their par value, or upon terms which it is alleged would in effect work an increase in the rate of interest to be paid upon said bonds in excess of that provided for in the ordinances calling the special election for the purpose of securing the approval of the electors of the city for each of these bond issues. The complaints in each of these actions proceed to allege that the defendants therein in thus intending and threatening to sell and dispose of the unsold bonds in each of said bond issues are acting professedly upon and under the authority of an act of the legislature of California, approved June 1, 1921, and entitled, "An act authorizing any county, city and county, city, town, district, or political subdivision organized under the laws of this state to sell any unsold bonds thereof at a price netting the purchaser not more than six per cent per annum payable semi-annually" [Stats. 1921, p. 844]; and that said statute is in violation of the Constitution of the United States and of the state of California, in that the same is retroactive and impairs the vested rights of the plaintiffs and interveners as taxpayers of said city, and of all other voters, property owners, and taxpayers thereof, and changes and impairs the obligation of the contract entered into by the voters of said city by and through said elections, and also of the contract which the said voters at said elections authorized the defendants to enter into in reference to the terms of issuance and sale of said bonds; and in so doing deprives these plaintiffs and all other property owners and taxpayers of said city of their property without due process of law.

The answers of the defendants in each of said actions consist chiefly in the denial that any threatened or contemplated sale of the remaining unsold portion of either of said bond issues would be in violation of the constitution of the United States or of the state of California, or of law, and in that respect the defendants deny that the act of the legislature approved on June 1, 1921, relating to the disposal of the remaining unsold bonds of municipalities upon the

terms provided in said act, is unconstitutional or void as violating any vested or other rights of said plaintiffs or of the voters, property owners, or taxpayers of the city of Los Angeles, or as impairing the obligation of any contract made or authorized by the voters of said city, or as depriving the property owners or taxpayers thereof of their property without due process of law. The defendants, therefore, prayed that the plaintiffs and intervener take nothing by their said actions.

Upon the trial of these actions the court made its findings to the effect that substantially all of the allegations of the plaintiffs in each case and of the intervener were true, with the exception of those allegations attacking the constitutionality of the act of the legislature approved June 1, 1921, or assailing the legality of the proposed sale of the remaining unsold portion of said bonds thereunder, or upon the terms proposed by said I. H. Hellman for the purchase by him of the whole of the later issue of said bonds. The court accordingly decided that the plaintiffs and intervener were entitled to take nothing by their respective actions, and that the defendants were entitled to judgment in their favor and for their costs. From these judgments the plaintiffs and the intervener, respectively, have prosecuted these appeals.

In order to reach a proper understanding of the questions presented for consideration upon these appeals, it is necessary that the several constitutional and statutory provisions involved in the discussion thereof should be set forth. Section 18 of article XI of the constitution of California provides:

"No county, city, town, township, board of education, or school district shall incur any indebtedness or liability in any manner or for any purpose exceeding in any year the income and revenue provided for such year, without the assent of two-thirds of the qualified voters thereof voting at any election to be held for that purpose. . . . Any indebtedness or liability incurred contrary to this provision . . . shall be void."

The statute of 1901 which provided the procedure for the creation of bonded indebtedness by cities, under which the city of Los Angeles proceeded in respect to both of the bond elections and bond issues in question here, contains, in section 2 thereof, the following provision:

". . . The ordinance calling such election shall recite the objects and purposes for which the indebtedness is proposed to be incurred, the estimated cost of the proposed public improvements, the amount of the principal of the indebtedness to be incurred therefor, and the rate of interest to be paid on said indebtedness, and shall fix the date on which such election will be held, the manner of holding such election and the voting for or against incurring such indebtedness, and in all particulars not recited in such ordinance, such election shall be held as provided by law for holding municipal elections in such municipality; provided, however, that if the rate to be paid on such indebtedness shall not exceed four and one-half per centum per annum, payable semi-annually, the rate of interest need not be recited in such ordinance, but in its discretion the said legislative branch may recite in such ordinance the maximum rate of interest to be paid on such indebtedness not exceeding six per centum per annum, payable semi-annually, which rate when so recited, shall not be exceeded in the issuance of bonds for such indebtedness."

The act of 1901 also provides, in section 6 thereof, that such bonds should be issued and sold "for not less than their par value." (Stats. 1901, p. 29.) The charter of the city of Los Angeles provides, in section 2, subdivision 29, that the city shall have the right and power:

"To incur indebtedness, by the issuance of bonds, for any of the purposes for which the city is authorized to provide, or for carrying out any of the powers possessed by the city; provided that, in the procedure for the creation of such bonded indebtedness, and for the issuance of such bonds, the general laws of the state of California, in force at the time such proceedings are taken, shall, so far as applicable, be observed and followed."

The bonded indebtedness and bond issues of said city in question herein were proposed and voted for by the electors of said city in conformity with the foregoing provisions of its said charter and of the act of 1901. The ordinances proposing each of said bond issues and calling the elections for the purpose of authorizing the same expressly provided that the maximum rate of interest to be paid upon the indebtedness evidenced by the first bond issue was to be four and one-half per centum per annum, payable semi-annually,

and by the second bond issue was to be five per cent per annum, payable semi-annually; and also expressly provided that said bonds should be issued in accordance with the provisions of the act of the legislature of 1901.

In 1921 the legislature adopted the act relating to the sale by municipalities of unsold bonds to which reference has heretofore been made. Section 1 of said act reads as follows:

"Section 1. Any county, city and county, city, town, district or other political subdivision organized under the laws of this state may sell any bonds thereof remaining unsold, and which have heretofore been authorized by the qualified electors thereof at an election called and held as provided by law, at a price which will net the purchaser not more than the equivalent of six (6) per cent per annum, payable semi-annually, on the par value of such bonds; provided, that this act shall not apply to any such bonds which have been authorized under a law permitting the sale thereof at a price netting the purchaser more than such equivalent." (Stats. 1921, p. 844.)

[1] The main contention of the appellants is that both the statutes of the state and the charter and ordinances of the city of Los Angeles, having relation to the two bond issues involved in the instant cases, do expressly prohibit the sale of said bonds for less than their par value; and the appellants further contend that this express prohibition reaches back to the very inception of the proposition for the creation of a bonded indebtedness in each case, and enters vitally into the vote of the electors of said city, granting permission to its officials to create a bonded indebtedness and issue these bonds upon the express condition and understanding that they were not to be sold for less than their par value. The statute of 1901, under the terms of which the proceedings leading up to the creation of the municipal indebtedness evidenced by each of these bond issues were taken, does contain the express provision that municipal bonds issued in accordance with its procedure should not be sold "for less than their par value." The charter of the city of Los Angeles adopts the provisions of the general laws in force at the time as the procedure to be followed in providing for such indebtedness and for the issuance of such bonds. (Stats. 1911, p. 2063.) The ordinances of said

city proposing these respective bond issues and providing
the procedure for holding the required elections conformed
to the provisions of the said act of 1901, and while they do
not expressly embrace the provision in said act that such
bonds, when issued, should not be sold for less than par,
they do so in effect by conforming to the general terms of
said act and advising the electors that their permission to
create such indebtedness and to issue such bonds is sought
under its terms and conditions, among which is the express
provision that the bonds so issued with their approval should
not be sold for less than their par value. We are con-
strained, therefore, to hold that this express prohibition of
the act of 1901 against the sale of the bonds in question at
less than their par value forbids the violation on the part
of the said city and of its officials of a vital and essential
condition upon which the permission of the electors of said
city for the creation of said indebtedness and issue of said
bonds was obtained. In arriving at this conclusion we are
mindful of the argument put forth by the respondents
herein to the effect that the provisions in the act of 1901
forbidding the sale of municipal bonds voted and issued
under its procedure for less than their par value is not to
be found in that portion of said statute prescribing what
shall be contained in the proposition to be submitted to the
electors for their approval; such as the objects and purposes
for which the indebtedness is proposed to be incurred, the
estimated cost of the proposed public improvements, the
rate of interest to be paid, and the like; and hence is not an
essential or mandatory portion of said statute, nor one
upon which the voters were required to exercise their elec-
tion. This argument is neither persuasive nor sound. The
electors of the city were advised by its charter and by its
ordinances calling these bond elections that the law under
which the city and its electors were acting in the matter of
the proposed creation of a bonded indebtedness and the
issue and disposition of these bonds was the act of 1901, all
of the provisions of which were presumably known to every
elector whose approval was sought thereon. [2] We do
not understand that it is essential, unless expressly made
so, that all of the terms and conditions of the statute under
which a bond election is to be held shall be set forth in the
ordinances calling such election, or detailed upon the ballot

submitting the main question to the voters for their approval; nor do we understand the case of *People etc.* v. *City of Los Angeles, ante,* p. 56, [200 Pac. 947], to so decide. It follows from the foregoing that any attempt on the part of said city or its officials to dispose of these bonds for less than their par value, while the state of the law under which the said indebtedness was proposed to and approved by the electors of said city remained unchanged, would have been abortive and could have been restrained at the suit of any property owner and taxpayer injuriously affected by such an act. [3] The respondents, however, contend that the law in relation to the price at which these respective bond issues were to be sold has not remained unchanged, and they direct our attention to the fact that the legislature of this state has enacted the statute approved June 1, 1921, the title and provisions of which are above quoted, enabling municipalities to sell any of the bonds thereof remaining unsold at the date of the approval of said act at a price which shall net the purchaser not more than the equivalent of six per cent per annum on the par value of said bonds. It is not disputed that the above provision in said act amounts to the granting of permission to municipalities to dispose of their remaining unsold bonds at a price below their par value; but the contention of the respondents is that the legislature, having originally had power to impose upon municipalities the aforesaid restriction against the sale of their bonds below par, had power through the passage of said act to remove said inhibition and relieve municipalities from the burden thereof. The respondents present this contention in several different forms. They argue, first, that by the terms of the charter of the city of Los Angeles, above quoted, it is provided that "in the procedure for the creation of such bonded indebtedness and for the issuance of such bonds, the general laws of the state of California in force at the time such proceedings are taken shall, so far as applicable, be observed and followed." The construction which the respondents would have us place upon this provision of the charter is that whatever changes the legislature might make in the general laws with relation to the bond issues of municipalities up to the time of the actual issuance and sale of such bonds would be controlling as to the issuance and sale of such bonds after the passage of the later

enactment. The respondents cite in support of this phase of their contention the case of *Fritz* v. *San Francisco,* 132 Cal. 373, [64 Pac. 556]. This case does not sustain the respondents' contention in that regard, but rather leans in the other direction, since it is therein decided that when the general law under which proceedings for the issuance of certain bonds had been initiated in the city of San Francisco was entirely superseded by the adoption of the charter of said city, which provided its own complete scheme for the issuance of municipal bonds, the bonds formerly voted for under the general law could not be issued under the provisions of the charter. We are also referred to the cases of *Brownell* v. *Town of Greenwich,* 114 N. Y. 518, [4 L. R. A. 685, 22 N. E. 24], and *Morgan* v. *Falls City,* 103 Neb. 795, [174 N. W. 421], as sustaining the respondents' contention. But the first of these cases it was merely held that a subsequent legislature might correct irregularities in the action of officials conducting a bond election which did not affect the consent of the taxpayers previously given; while in the latter case it was expressly held that an attempted statutory change in the terms of the bonds voted for under a prior law, providing that they should become due in forty years but be payable at any time after ten years, which change would make such bonds fall due in twenty years and payable at any time after five years, could not be permitted, the court holding that this was a substantial change affecting the rights of the taxpayers. The court also held that ''The proposition to make the bonds payable at any time after five years was never submitted to the voters; hence was never adopted by them; bonds issued must conform to the proposition adopted by the electors.'' But aside from the inaptitude of these citations we do not accept the construction of the Los Angeles charter provision for which the respondents contend, since to do so to the extent claimed would be to sanction an entire subversion of the will of the electors as to practically all of the conditions upon which their consent to the incurring of the indebtedness and the issuance and disposition of the bonds had been obtained through the simple expediency of a legislative enactment. For reasons hereafter to be given, such an interpretation of the charter provision should not be adopted.

The respondent further urges in support of its main contention in this regard that since the legislature in adopting the statute of 1901 might have omitted the requirement as to the sale of bonds to be voted and issued thereunder for not less than their par value, a subsequent legislature would have power to relax or remove this restriction at any time; and we are cited to the case of *Cole* v. *City of Los Angeles,* 180 Cal. 617, [182 Pac. 436] as sustaining this view. In the above-cited case the question was whether or not the statement in the ordinance calling the election that "the maximum rate of interest to be paid on said indebtedness shall be six per cent per annum payable semi-annually" complied with the statute which required the ordinance calling the election to state "the rate of interest to be paid on the indebtedness." It was held that such variance could be cured by statute. There the electorate were fully advised as to the maximum indebtedness to be incurred and voted for such maximum and no constitutional question was involved.

The respondents finally urge that a subsequent legislature would have power to change this requirement in the earlier statute under which these bonds were voted, for the reason that the electors, in voting to approve the creation of the indebtedness and issue and sale of the bonds in the form and upon the terms specified in such statute, did so with the knowledge that the terms of such statute were subject to legislative change and, therefore, gave their approval of these bond issues with the understanding that such changes might be made. This argument is nothing more nor less than a seductive sophistry, since to give it the application for which the respondents contend would be to render every substantial statutory or contractual right of individuals subject to be taken away for no better reason than that they had acted or contracted in view of possible changes in the law. There is one comprehensive answer to each and all of the foregoing arguments of the respondents in support of the general proposition that the act of the legislature of 1921 has been effectual to remove the requirement of the act of 1901, that these bonds should be voted for and issued upon condition that they should not be sold for less than their par value. It is this: The constitution, by virtue of the section above quoted, gives to the electors of a municipality the substantial right to grant or refuse their approval to the in-

curring of any indebtedness beyond the limit expressed in said constitutional provision. The act of the legislature of 1901, in giving effect to this provision of the constitution by providing the procedure in conformity with which the electors' approval or disapproval of a proposed bonded indebtedness was to be expressed, has provided the particular terms and conditions upon which the approval of the electors might be secured. Among these were the requirements that the ordinances calling the election should recite the objects and purposes for which the indebtedness was proposed to be incurred, the estimated cost of the public improvement to which the funds secured were to be applied, the amount of the principal of the indebtedness, the rate of interest to be paid thereon. These recitals must be set forth in the ordinances providing for and calling the election, but, in addition to these, there is the added provision that the bonds when issued should be sold "for not less than their par value." This provision in the act has a twofold purpose: First, to assure the electors that the entire sum for which they vote to burden themselves and their city with a bond issue will be realized from the sale of the bonds; second, to assure the electors that the objects and purposes for which the bonded indebtedness is to be incurred shall be fully subserved through the application of the whole face value of the bonds to such objects and purposes. This thought is well expressed in the case of *Uhler* v. *City of Olympia,* 87 Wash. 1, [151 Pac. 117], where the court, in dealing with an attempted payment of commissions and compensation for selling certain municipal bonds, aptly said: "The limitation in the power of the council is just as prohibitive, and, if disobeyed, would result in the same evil, as if the statute had provided that the bonds should be sold at not less than par. In either case the object of the law is to prevent speculation in municipal securities, and to insure to those who must ultimately pay the bonds a dollar in lawful currency for every dollar of obligations issued."

In these aspects this stipulation in the statute providing for the bond election is as vital as any other provisions in it, since it goes directly to the matter of the relative amount of the burden and benefit which the electors are to agree by their votes to assume. The proposition having thus been made by the officials of a city to the voters thereof to ap-

prove a bonded indebtedness for the specified purposes
in the specific amount of principal, at the specified rates
of interest and upon the express assurance that the bond
issues, if approved, should not be sold for less than their
par value, what relation is created as between the city,
through its officials on the one hand and the electors on
the other, by the latter's formal acceptance of such propo-
sition through the required vote? In some jurisdictions
it has been held that the relation thus created is a con-
tractual one, which cannot be changed in any essential
particular by the officials of the city, either with or with-
out the aid of later legislation. In the case of *Merchants
etc. Bank* v. *Escondido Irr. Dist.,* 144 Cal. 329, [77 Pac.
937], which involved the question as to whether the board
of directors of an irrigation district, after the property
owners forming the district had voted to issue bonds for
the purpose of carrying out the object of its formation,
under an act declaring how said bonds should be paid,
could be permitted by a later and amendatory act, to pro-
vide a different method of payment of the indebtedness
secured by said bonds, this court said:

"The act providing for the organization of the dis-
trict, and the organization of the district under the pro-
visions of the act by the vote of its electors, cannot be
otherwise regarded than as a contract between the state
and the individuals whose property was thereby affected.
The contract, indeed, lacks one of the ordinary elements
of contracts—namely, the actual consent of all the parties
to it; but by the provisions of the statute the majority of
the electors were empowered to act and consent for the
individual proprietor; and unless this were a legitimate
exercise of the powers of the state, the statute itself would
be invalid. Hence the consent of all the parties to the
contract was in fact given either personally or by their
authorized agents; and there was thus created a complete
contract between the parties by the terms of which the
property owners in the district consented to the burden
imposed upon their property by the provisions of section
17 of the original act and to no other. The burden thus
imposed was, that the bonds issued under the act should
'be paid by revenue derived from an annual assessment
upon the real property of the district,' and that their

lands should 'be and remain liable' for such assessment; and this implied that this should be the extent of the burden. But by the amendatory act the board of directors is authorized, without the consent, or even the knowledge, of the land owners, to pledge or hypothecate the property acquired by their contributions—that is to say, acquired with their money—and thus to subject them to the liability of losing entirely the property thus acquired; which is not only their property, but by the express provision of the statute (sec. 13) has been 'dedicated and set apart to the uses and purposes set forth in the original act'; which would leave them only the liability for continued assessments until the balance of the bonds shall be paid. We have no doubt, therefore, that in this respect also the legislature went beyond its constitutional powers."

The authorities in other jurisdictions holding the same view are *Deland* v. *Platt Co.,* 54 Fed. 823; *David* v. *Timon* (Tex. Civ. App.), 183 S. W. 88; *Scott* v. *Forest,* 174 Ky. 672, [192 S. W. 691]; *Percival* v. *City of Covington,* 191 Ky. 337, [230 S. W. 300]; *Wullenwaber* v. *Dunnigan,* 30 Neb. 877, [13 L. R. A. 811, 47 N. W. 420]; *Lawson* v. *Kenawho Co. Court,* 80 W. Va. 612, [92 S. E. 786]. [4] We do not, however, deem it necessary to go so far in this case as to hold that a contractual relation, in the ordinary sense of the term, has been created between the electors of the city of Los Angeles and the officials thereof by the proposal and approval of these bond issues, but we are satisfied that a status analogous to such relation was created through the exercise of the constitutional right of the electors of said city in approving the creation of the bonded indebtedness represented in these two bond issues upon the express conditions and assurances contained in the act of 1901, which may not be changed in the manner and to the extent it is sought to be changed under the provisions of the act of 1921, without working, in effect, a fraud upon the electors through securing their votes for the approval of these bond issues upon terms and conditions which will not be kept if the attempted sale of these bonds below their par value is given the sanction of this court. In the case of *Wallace* v. *Bell,* 205 Ala. 623, [88 South. 442], the court, in

dealing with a similar constitutional provision to ours, and with similar situation to that presented in these cases, through the attempted legislation identical in effect to that of the statute of 1921, says:

"A majority of the voters answered by ballot 'yes.' Now, the legislature attempts by this act, without any clear intimation thereof in its title, to authorize these bonds sold at a discount—below par—which will net to the purchaser seven per cent per annum on his investment. The interest on the bond is a part of the bond. If the legislature can increase the rate of interest, or sell the bonds below par after the voters authorized a sale at par and at five per cent interest, then they can take away entirely from the majority of the voters the right to have the bonds issued. The constitution gives the legislature the right to fix the mode and manner of getting the will of the qualified voters on a bond issue; and it gives to the majority of the qualified voters at the election the right to authorize the issuance of the bonds by the board of revenue. The voters having fixed by ballot the amount of the bond issue, the maximum rate of interest, and under a law stating that they must not be sold below their face value, it is then beyond the power of the legislature to authorize a higher rate of interest thereon or a sale of these bonds below par."

In the case of *Skinner* v. *City of Santa Rosa*, 107 Cal. 464, [29 L. R. A. 512, 40 Pac. 742], which was a case wherein the officials of the city of Santa Rosa had undertaken to change the amount of interest to be paid upon certain municipal bonds of said city, after a vote of its electors approving the issue of such bonds, this court held that the provision for the payment of the added interest upon said bonds would in effect increase the amount of the indebtedness which the electors had by their votes approved, and would to that extent be a violation of the constitutional inhibition. And the court goes on to say:

"If the terms and conditions submitted to the electors may be departed from, and such election held to authorize the issuance of bonds under other terms and conditions, a door will be opened authorizing the common council to submit a proposition so favorable as to secure beyond question a favorable vote, and then change the conditions

as to rate of interest and otherwise, even without any fraudulent purpose or intent, so that, if again submitted, an overwhelming defeat would result. . . . In the case at bar, where the question arises before the bonds have been delivered, we hold that the city has no power to issue them in a form which does not substantially comply with the terms stated in the ordinance of submission and notice of election, and with the statute under which the proceedings were had."

It is not intended by anything said in this opinion to suggest or intimate that there was any actual fraudulent intent on the part of the officials of the city of Los Angeles in seeking to take advantage of the terms of the statute of 1921 by disposing of these bond issues at less than their par value. Nevertheless, so to do either with or without the sanction of said act would be to accomplish a purpose directly violative of one of the essential conditions upon which the constitutional approval by the electors of said city of these bond issues was obtained, and in that sense a fraud would be wrought by permitting that condition to be violated by the sale of these bonds below par. For this reason we are constrained to hold that the authorization attempted to be conferred upon said city of Los Angeles to dispose of the unsold portion of these bond issues for less than their par value by the act of 1921 is invalid, and hence that the plaintiffs and intervener in these actions were entitled to an injunction restraining such attempted or threatened sales.

The judgment is reversed.

Waste, J., Wilbur, J., Sloane, J., Shurtleff, J., and Lennon, J., concurred.

SHAW, C. J., Concurring.—I concur in the foregoing opinion.

I wish to add, however, that, in my opinion, the vote of the people, by which the city was authorized to sell the bonds at a price not less than par, constituted a part, and a material part, of the contract evidenced by the bonds, as stated in *Merchants Nat. Bank* v. *Escondido Irr. Dist.*, 144 Cal. 329, [77 Pac. 937]. The city is the nominal obligor or promisor on the bonds. It has no authority to

make the promise and issue the bonds, except such as it obtained by this vote, and that authority was conditioned that the buyer of the bonds, the promisee, should pay to the city at least the par value as the consideration thereof. The real payors of the bonds are the people who pay the taxes levied to raise the fund for that purpose. They are, under the constitutional scheme, in substance and effect the principals whose authority must be first given, in order to authorize their agent, the city, to make the contract. This authority, as evidenced by the records of the election at which the authority was given, must be considered as a part of the contract, at least to the extent that the conditions therein stated cannot be disregarded by the city in selling the bonds, nor by the purchaser at the sale, and this being so, it necessarily follows that an act of the legislature purporting to authorize a disregard thereof would, if valid, impair a material portion of the contractual obligation.