[Civ. No. 29157. Second Dist., Div. Four. May 25, 1965.]

CITY OF LOS ANGELES et al., Petitioners, v. T. D. DANNENBRINK, Respondent; TITLE INSURANCE AND TRUST COMPANY et al., Real Parties in Interest.

Roger Arnebergh, City Attorney, Bourke Jones and Milton N. Sherman, Assistant City Attorneys, O'Melveny & Myers, James W. Beebe, Howard J. Deards and James L. Beebe for Petitioners.

Knapp, Gill, Hibbert & Stevens, and Joseph C. Gill for Respondent.

No appearance for Real Parties in Interest.

FILES, P. J.—This proceeding in mandamus is brought for the purpose of testing the power of the Department of Airports of the City of Los Angeles to issue revenue bonds pursuant to a city charter amendment approved by the voters of Los Angeles on April 2, 1963.

The petitioners are the City of Los Angeles, the Department of Airports of the city, the Board of Airport Commissioners of the city and the members of that board. The respondent is the secretary of the board, who is alleged to have refused to publish the resolution of the board authorizing the issuance of $30,000,000 of revenue bonds of the department. The petition also names as real parties in interest all of the persons who are registered with the city treasurer as owners of any of the general obligation bonds of the 1956 Airport Bond Issue.[1]

The petition sets forth in some detail the circumstances leading to the authorization of the proposed revenue bonds. Pertinent documents have been incorporated as exhibits to the petition. Counsel appearing for the respondent has filed a demurrer to the petition, points and authorities and an answer which admits all of the facts in the petition and denies only the conclusion that a writ should issue. None of the present bondholders has appeared, and no one has presented himself as either an intervener or as amicus curiae. The case is thus submitted to the court for determination of the legal issues raised by the facts stated in the petition with its supporting exhibits.[2]

[1]The 1956 issue consists of $59,700,000 face value of bearer bonds. Only seven bondholders have registered their holdings aggregating $454,000. The holders of the remainder of the 1956 bearer bonds are unidentified. The petition alleges that the named bondholders are joined "as representative of all holders of said bonds."

[2]The petition has been augmented by a stipulation which incorporates two exhibits not included originally.

## I

In conformity with subdivision (a) of rule 56 of the California Rules of Court, petitioners have set forth the circumstances which, in the opinion of petitioners, render it proper that the writ should issue originally from a reviewing court.

The Los Angeles International Airport is at present the second busiest commercial airport in the world and serves the entire southern California region. At the present time the north runway is unsuitable for transcontinental jet airplanes due to insufficient length and insufficient clear zone at its windward end. It is important to the efficient operation of the airport that the north runway be developed for jet operations. The Federal Aviation Agency has made a grant of funds to aid development of the north runway complex, but this grant must be matched by the city. A long-range program of other improvements is contemplated, to be financed by the sale of the revenue bonds here in controversy. One immediate need is for an expansion of parking facilities beyond what can be financed out of current revenues. These circumstances appear to justify this court in giving immediate attention to the legal issues raised by this original proceeding.

The airport is a going concern, a public utility whose adequacy and efficiency are of great importance to the welfare of the community as a whole, to the aviation industry and those allied with it, and to a great many other persons. Now that those authorized to manage the airport have concluded that improvements are necessary, it becomes a matter of high importance to determine promptly whether the means proposed in financing such improvements are in conformity with law. (Cf. *County of Los Angeles* v. *Nesvig,* 231 Cal.App.2d 603, 608 [41 Cal.Rptr. 918], accepting an original mandamus proceeding to test a contract to add to the partially built Music Center, as contrasted with *County of Los Angeles* v. *Nesvig,* 231 Cal.App.2d 600 [41 Cal.Rptr. 916], refusing to entertain an original proceeding to validate a contract for a proposed museum.)

In *Golden Gate Bridge etc. Dist.* v. *Felt,* 214 Cal. 308, at pp. 315-320 [5 P.2d 585], the court set forth its reasons for passing upon the validity of a proposed bond issue in a "friendly suit" against an employee of the issuing agency. The reasoning of that opinion, along with the many cases of this kind which have since been heard, fully justify this court

in hearing and passing upon the validity of the proposed issue of the airport revenue bonds.

## II

It is the argument of respondent that the Los Angeles City Charter Amendment under which the proposed bonds are to be issued is invalid on two grounds: (1) That it impairs the obligation of the bonds issued in 1956 and 1945; and (2) That it violates the rights of the taxpayers and voters in changing certain provisions of the charter under which the 1956 bonds were issued. Before discussing these contentions it is helpful to set forth some of the factual background leading up to this controversy.

In 1940, the Charter of the City of Los Angeles was amended by adding section 4, which created the Airport Revenue Fund, into which all revenues from the airport were to be deposited.

At an election on May 6, 1941, the voters approved an issue of general obligation bonds in the amount of $3,500,000 for the purpose of exercising the city's option to purchase the airport which, up to that time, had been operated by the city under a lease agreement. At the same time section 4.1 was added to the charter. It provided that money in the Airport Revenue Fund was to be expended for certain stated purposes and no others, one of which was the payment of principal and interest on airport general obligation bonds. Section 4.1 also provided that all money received in the fund must remain there until expended for one of the stated purposes.

All of the 1941 bonds have now matured, the last maturing in 1956.[3]

On May 1, 1945, the electors of the city authorized the issuance of $12,500,000 of general obligation bonds for the improvement of the airport. These bonds were subsequently sold, and some are still outstanding.

In 1947, a new article was added to the city charter relating to the airport department. Section 239.8 of this new article provided for the Airport Revenue Fund and made the provisions of sections 4 and 4.1 applicable to that fund.

At an election held May 29, 1951, sections 4 and 4.1 were repealed and section 239.8 was amended to eliminate the requirement that surplus revenue of the airport must be appropriated for payment of principal and interest of general obligation bonds.

---

[3] We assume that all of these bonds have been redeemed or that funds for redemption are on hand awaiting presentation of bonds which are outstanding.

At the same 1951 election a proposal to authorize a $14,500,-000 airport general obligation bond issue was defeated. In 1953 another general obligation bond issue in the sum of $33,255,000 for airport purposes was rejected by the voters.

Following those two defeats a series of consultations were held between representatives of the airport and representatives of taxpayer organizations. It was suggested that the 1951 amendment of section 239.8 was a reason for the defeat of the bond proposals and that there would be a much better chance of success in the future if voters were assured that bonds would be paid out of airport revenues instead of out of the proceeds of special taxes levied for that purpose.

Subsequently section 239.9 was drafted for submission to the voters. This new section provided in substance that, until June 30, 1969, all money in the Airport Revenue Fund after payment of operating expenses shall be appropriated for the payment of principal, interest and redemption of airport bonds issued after June 1, 1956; and that after June 30, 1969, the moneys in the fund might be used for certain other purposes only after airport requirements, including bond servicing, had been satisfied.

This proposed charter amendment was submitted to the voters in a "special municipal election" which was consolidated with the state primary election held June 5, 1956. At the same time the city council also called a "special municipal election" to be held on the same day for the purpose of submitting to the voters a proposed $59,700,000 bond issue for airport development. Thus the proposed charter amendment and the proposed bond issue appeared on the same ballot as municipal propositions "A" and "B" respectively. Both propositions carried by majorities of better than five to one.

The charter amendment, by its terms, was to take effect only in the event the city issued any bonds authorized at the election of June 5, 1956. On the other hand neither the ordinance submitting the 1956 bond proposition to the voters nor the statement of the bond proposition on the ballot made any reference to the proposed charter amendment.

Bonds authorized at the 1956 election have since been sold and remain outstanding. The full amount needed for the payment of principal and interest each year on these bonds has been met exclusively from the Airport Revenue Fund, and no tax has been levied for that purpose.

On April 2, 1963, the voters of the City of Los Angeles approved a charter amendment repealing section 239.9, amend-

ing section 239.8 and adding sections 240 and 240.1. In substance this amendment of section 239.8 provides that the Airport Revenue Fund shall be used only in accordance with the following priorities:

First, payment of principal and interest on the 1956 airport bonds;

Second, establishment of a reserve equal to the amount required to service the 1956 airport bonds for the succeeding fiscal year;

Third, payment of principal and interest on revenue bonds to be issued in the future;

Fourth, establishment of a "Maintenance and Operation Reserve Fund";

Fifth, payment of maintenance and operation expenses;

Sixth, payment of principal and interest on the 1945 airport bonds, and then to other specified airport uses not here material.

New section 240, approved in the 1963 election, authorizes the Department of Airports to sell bonds payable solely out of the Airport Revenue Fund. Pursuant to this provision of the charter the Board of Airport Commissioners adopted a resolution authorizing the issuance of $30,000,000 of airport revenue bonds. This is the resolution which the secretary of the board has refused to publish upon the asserted ground of its invalidity.

### III

Respondent's argument that the 1963 charter amendment impairs the obligation of the 1956 bonds is based upon the assumption that the terms of section 239.9, as enacted in 1956, are a part of the bondholders' contract. The argument assumes further that the Airport Revenue Fund is security for the payment of the 1956 bonds, and that this security was substantially impaired when the 1963 amendment eliminated the requirement that all of the fund, after payment of certain current expenses, be set aside for payment of principal, interest and redemption of the 1956 bonds. Respondent's position is that the Airport Revenue Fund was, in effect, pledged to the payment of the 1956 bonds.

The direct answer to that argument is that both premises are wrong. The bonds on their face state that they are issued in compliance with the provisions of article 1, chapter 4, division 4, title 4, of the Government Code of the State of

California (i.e., the Bond Act of 1901, Gov. Code, § 43600 et seq.). This article prescribes the manner in which a city may issue its general obligation bonds for municipal improvements. There is nothing in that article to indicate that any particular fund shall constitute security for the indebtedness.[4] Section 43632, which is a part of that article, requires that the city annually levy and collect a tax sufficient to pay current bond requirements. The face of each bond contains the unconditional promise of the city to pay the bearer the amount stated upon presentation and surrender of the bond. There is no mention of the Airport Revenue Fund.

Other documents which reflect the terms of the transaction lend no support whatever to the idea that the segregation of airport revenues is any part of the bondholders' contract. Neither ordinance number 107320 calling the bond election, the notices of the city clerk inviting bids, nor the written bids under which the bonds were sold, contains any mention of airport revenues or the Airport Revenue Fund. The notice inviting bids refers to the bonds as "general obligation bonds of the City of Los Angeles." Under the heading of SECURITY the notice declares that "the City of Los Angeles shall levy and collect a tax sufficient to pay the interest on such bonds as it falls due and to constitute a sinking fund for the payment of the principal thereon on or before maturity. Said tax ... shall be turned over to and paid into the Municipal Airport Bonds Election 1956, Interest and Sinking Fund ... To the extent that, pursuant to Charter provision or otherwise, moneys are actually placed in said fund from a source other than said annual tax levy, the tax hereinbefore required to be levied may be reduced, and if all the moneys required to be raised by any such annual tax levy have actually been placed in said fund from such other source, the tax levy hereinbefore required for such year need not be made."

The obligation described here is simply the obligation imposed under Government Code section 43632 to levy and collect a tax sufficient to service the bonds, with the proviso that if the money is supplied from another source, the tax need not be levied. This language is clearly inconsistent with respondent's assumption that the city promised the bondholders to pay out of airport revenues. On the contrary, this language emphasizes that the city merely reserved the privilege of

---

[4]Statutory authorization for a pledge of revenue to secure general obligation bonds now appears in article 4 of the Government Code (§§ 53500-53505) enacted in 1961.

using money ''from a source other than said annual tax levy'' if it chose to do so.

·The bid letters submitted by the organizations which purchased the bonds from the city are consistent with the other documents. A typical example is the letter of Halsey, Stuart & Co., Inc., containing its successful bid on the first offering of this bond issue. The bid refers to ''Municipal Airport General Obligation Bonds of the City of Los Angeles, which will constitute valid legally binding obligations of the City, payable from taxes which may be levied without limitation as to rate or amount, upon all of the taxable real property of the City and which under the laws now in force may be levied without limitation as to rate or amount upon all taxable personal property except certain classes thereof in the City. . . .''

The interpretation of the bondholders' contract which is derived from the language of the bonds and the relevant documents is supported by the circumstances under which the 1956 bond issue was proposed and approved. After the voters had rejected two successive airport bond issues there was a reason to write into the charter a plan whereby the taxpayers could be told that new airport bonds would not. result in increased property taxes. From the facts set forth in the petition it is a reasonable conclusion that the 1956 charter amendment was intended not to give additional security to the bondholders but to make the bond issue more attractive to the property owners.

Respondent places reliance upon the general language found in some of the cases to the effect that the laws, under the authority of which the bonds were issued, are a part of the contract which may not thereafter be impaired by a change in those laws. It is then argued that section 239.9 of the city charter, as it read after the 1956 amendment, is a part of the law under which the bonds were issued.

The authorities cited by respondent do not go so far as to indicate that every change of law pertaining to the fiscal· affairs of the municipality affects the obligation of the bond-- holders' contract. The real issue is whether the law which is changed is one which is a part of the contract between the city and the bondholders.

The purpose and effect of section 239.9 was to limit and control the discretion of the city officials who manage the fiscal affairs of the airport. Such limitations upon official action are necessary and proper for reasons quite apart from the protection of creditors. It is essential to distinguish such

controls from the provisions of law which are a part of the creditors' contract. ■■■ Laws which are enacted solely as a matter of internal administration are not necessarily a part of the contract which is constitutionally protected against change. (Cf. *State School Bldg. Fin. Com.* v. *Betts,* 216 Cal. App.2d 685 [31 Cal.Rptr. 258] ; *Sacramento Municipal Util. Dist.* v. *Spink,* 145 Cal.App.2d 568 [303 P.2d 46].) It would be unthinkable to freeze all laws pertaining to the financial management of a city for as long as it had bonds outstanding.

■■■ It may be conceded that almost any change in the laws pertaining to a city's fiscal affairs may have some potential effect upon the city's long-term creditors. For example, changes in law authorizing new taxes to finance extravagant new programs might eventually impair the city's ability to collect the taxes needed to service general obligation bonds. The risk that the city's affairs may be managed differently in the future is one of the risks a lender assumes, except to the extent that his agreement provides against it. Municipal bonds, and the documentation surrounding their authorization and sale, are carefully drafted by experts. The written evidence of the terms of the 1956 bond issue surely would be different from what it is if the city had contractually bound itself to hold the Airport Revenue Fund for the benefit of the bondholders. What was written in the 1956 charter amendment for the benefit of the taxpayers was separate and distinct from what was written for the benefit of the bond purchasers in the statutes and ordinances authorizing the bond issue.

■■■ What has already been said about the 1956 bonds applies as well to respondent's argument concerning section 4.1 of the charter and the 1945 bonds. Section 4.1, added in 1941, contained a provision that money in the Airport Revenue Fund must be used only for certain stated purposes, one of which was to pay principal and interest on airport bonds. Section 4.1 also provided that there must be appropriated each year from the Permanent Improvement Fund of the city (created by § 3 of the charter) an amount which, together with any amount appropriated from the Airport Revenue Fund, shall be sufficient to service airport bonds. The airport bonds authorized in 1945 and sold in 1946 and 1947 were general obligation bonds. There is nothing in the record before this court to indicate that the city's obligation to the holders of the 1945 bonds is any greater than the obligation to the holders of the 1956 bonds—that is, to pay the amounts

stated therein and to impose such property taxes annually as might be needed to accomplish this result. Section 4.1, then, must be regarded not as a part of the bondholders' contract, but as a matter of internal fiscal administration, which might be revised or repealed at any time by charter amendment. The obligation of the 1945 bonds has not been impaired either by the repeal of section 4.1 in 1951 or the adoption of the charter amendment of 1963.

## IV

█  Respondent's contention that the 1963 charter amendment violates the rights of the taxpayers and voters is grounded upon the assumption that section 239.9 was a part of the terms and conditions upon which the voters gave their consent to the 1956 bond issue. Respondent's argument then proceeds with the citation of cases holding that after the voters have approved a bond issue containing certain terms, public officials may not proceed in a way contrary to the terms of the consent given.

The assumption underlying this argument in this case is unsound. The charter amendment and the bond issue were submitted to the voters as separate propositions. The fact that they appeared on the same ballot, and doubtless were supported by the same advocates, does not alter the situation. Though the charter amendment was by its own terms to take effect only if a bond issue was approved at the same election, there was no corresponding limitation in the bond proposition. The voters' approval of the bond issue must be taken as subject to the terms indicated in the bond proposition, but not at all conditioned upon either the adoption or the continued existence of section 239.9.

Examination of two of the cases cited by respondent will illustrate the distinction. In *Skinner* v. *City of Santa Rosa,* 107 Cal. 464 [40 P. 742, 29 L.R.A. 512], the voters approved the sale of bonds, which, as described in the ordinance calling the election, were to be payable at the city treasury in gold coin or lawful money with interest at 4 per cent payable annually. The city was unable to sell any bonds in this form and so the city council adopted an ordinance changing the form of the bonds to make them payable in New York City in gold coin with interest payable semiannually. The Supreme Court pointed out that these were substantial changes in the terms of the bonds and expressed its conclusion thus (at p. 476):

"In the case at bar, where the question arises before the bonds have been delivered, we hold that the city has no power to issue them in a form which does not substantially comply with the terms stated in the ordinance of submission and notice of election, and with the statute under which the proceedings were had."

In the present case, there is no departure from the terms specified in the ordinances calling the 1956 bond election. Neither has there been any change in the statute under which the proceedings were had, this being the portion of the Government Code specifically mentioned in the ordinances and in the bonds.

*Peery* v. *City of Los Angeles,* 187 Cal. 753 [203 P. 992, 19 A.L.R. 1044], involved bonds which were authorized by elections held in 1914 and 1919, under the Bond Act of 1901. The ordinances calling the elections specified that the maximum rates of interest to be paid semiannually were 4½ per cent, and 5 per cent, respectively. A portion of those bonds remained unsold. In 1921 the state Legislature enacted a statute authorizing any city to sell unsold bonds at a price netting the purchaser not more than 6 per cent per annum. The city council then adopted a resolution accepting a proposal to sell the bonds at a discount to yield the purchaser a rate of interest in excess of 5 per cent. The Supreme Court concluded that to sell these bonds on such terms was a violation of one of the conditions on which the approval of the voters had been obtained, and that an injunction should issue to forbid the sale.

In *Warfield* v. *Anglo & London Paris Nat. Bank,* 202 Cal. 345 [260 P. 881], water bonds of the City of San Francisco had been authorized at an election held in 1910. The proposition submitted to the voters had declared that the bonds would bear interest at a rate not exceeding 5 per cent. Bonds were thereupon issued containing a stated interest rate of 4½ per cent. The bonds remained unsold until after the voters had adopted a charter amendment in 1920 which authorized the sale of these bonds for less than par and at a rate of interest not in excess of 5½ per cent. Thereupon the bonds were sold at a price below par. The action was then brought by a taxpayer to compel the bondholders to pay into the city treasury the difference between the par value and the selling price. The Supreme Court, in a unanimous opinion, held the action to be barred by laches. A concurring opinion, signed by five justices, declared that the 1920 amendment to

the city charter, being the act of the electors of the city, was sufficient authorization for the sale of bonds at a price below par. The *Peery* case was distinguished upon this ground.

The *Peery* case is distinguishable from the case at bench not only upon the grounds expressed in *Warfield,* but on the additional ground that the terms of the contract between the city and the bondholders remains exactly as expressed in the ordinance calling the 1956 bond election.

There are sound practical reasons why the law should not declare that, after the electorate has approved a bond issue it may not, while the bonds are outstanding, modify any of the fiscal policies previously established for the benefit of the city (as distinguished from controls which are created for the protection of the bondholders). In the present situation it is fair to assume that the voters adopted section 239.9 at the 1956 election for the purpose of preventing the city council from diverting airport revenues to nonairport uses while raising taxes to service airport bonds. To this end section 239.9 called for an impounding of surplus airport funds. But with the increase in air traffic and the development of transcontinental and intercontinental jet service, substantial capital improvements again became necessary. With the prospect of constantly rising airport revenues, one might reasonably conclude that the impounding of surplus revenues was unnecessary, and that current airport revenues should be more than adequate each year to service present and future bonds without the maintenance of that particular reserve, so long as the airport continued to operate efficiently. If, as the board has determined, there is an immediate need for an additional jet runway and for additional parking facilities in order to provide adequate and efficient service, the limitations imposed by the 1956 charter amendment may be looked upon as an unnecessary handicap. Investment in the proposed new facilities might be thought to make the airport even better able to pay for itself, including the extra cost of the projected improvements. When confronted with the proposal to repeal section 239.9 and replace it with section 239.8, the voters had the opportunity to decide whether the purposes which motivated the enactment of the former section could now better be served by the enactment of the new one. It would be most unfortunate if the electors were foreclosed from making such a decision by any doctrine that the charter provisions which they had enacted for their own protection could not be modified when they had reached the

conclusion that some other system would be preferable.

Finally, respondent suggests that somehow the voters of the City of Los Angeles have been misled. Respondent refers to some of the campaign statements made by public officials and private citizens in support of the 1956 ballot propositions, which have been included as exhibits to the petition. It is argued that there were "representations" and "assurances" upon which the voters placed "reliance" that section 239.9, if adopted, would protect the taxpayers. It is argued that the effect of the 1963 amendment was not properly explained to the voters.

A system of law which authorizes the electorate to pass upon proposed charter amendments will not permit a court to assume that the voters did not know what they were doing when they voted upon a specific proposal. Moreover, if the enlightenment of the electorate should be a subject of judicial inquiry, the court could not infer that the knowledge of the voters was limited to what appeared in the campaign propaganda of the protagonists. The full text of each proposed charter amendment, including the matter to be stricken, was mailed to every voter well in advance of election day. No public official or private citizen is authorized to change the substance or effect of such a proposal by the characterization he employs in advocating its adoption or defeat.

The facts alleged in the petition here, and admitted to be true by respondent, compel the conclusion that sections 239.8, 240 and 240.1 of the Los Angeles City Charter are valid and that petitioners are entitled to an order compelling the respondent to publish the resolution adopted pursuant to those sections.

Let a peremptory writ issue.

Kingsley, J., and Frampton, J. pro tem.,* concurred.

---

*Assigned by the Chairman of the Judicial Council.