[Civ. No. 33734.   Second Dist., Div. Four.   Feb. 10, 1969.]

CITY OF LOS ANGELES, Petitioner, v. REX E. LAYTON, as City Clerk, etc., Respondent.

Roger Arnebergh, City Attorney, and Bourke Jones, Assistant City Attorney, for Petitioner.

Spencer L. Halverson for Respondent.

Fadem & Kanner and Gideon Kanner as Amici Curiae on behalf of Respondent.

DUNN, J.—On petition of the City of Los Angeles, we issued an original alternative writ of mandate requiring the clerk of that city to publish an ordinance regularly adopted by the city council, or show cause why he should not do so. (Publication of an ordinance is required under the city charter as a condition precedent to its effectiveness.) The matter is at issue before us on a general demurrer by way of return filed by the city clerk (rule 56 on Appeal, Cal. Rules of Court; Code Civ. Proc., § 1089).

In August 1968, the petitioner, through its council and mayor, adopted and approved an ordinance providing a procedure for the issuance of revenue bonds. The ordinance permits "Any department, bureau, board or officer . . . having the authority to manage and control any revenue producing municipal facility" to submit to the Council a request for authority ". . . to issue revenue bonds for the acquisition, construction, improvement or completion, or any combination thereof, of such revenue producing facility." The "facility" mentioned in the ordinance may generally be categorized as involving public parking, golfing, and equestrian facilities. Facilities under the management and control of the harbor department, department of airports and department of water and power are specifically excluded from the procedures adopted.

The validity of the ordinance is challenged on the ground that it conflicts with article I, section 3(4) of the Charter of the City of Los Angeles (Stats., 1925, pp. 1030-31, reading as follows: "(4) The general laws of the State of California establishing the procedure for the creation of bonded indebtedness in force at the time any bonded indebtedness is created by the city shall, so far as applicable, be observed and followed." This in turn, leads to the general laws of the state and more particularly to the Revenue Bond Law of 1941 (Gov. Code, §§ 54300-54700) and its various requirements including, among others, a requirement that the city, by resolution of its council, submit to its qualified voters the proposition of issuing revenue bonds. (Gov. Code, § 54380.) A majority vote is required to authorize issuance of the bonds. (Gov. Code, § 54386.)

The City of Los Angeles is a freeholders' charter city availing itself of the "home rule" provisions of California Constitution, article XI, sections 6 and 8. Its charter was adopted by a majority of its qualified electors voting at a special election. The charter so adopted gives specific authorization for

issuance of revenue bonds by the harbor and airport departments and the department of water and power. However, other city functionaries are not so endowed. It is respondent's position that the ordinance in question seeks to authorize the issuance of revenue bonds without securing prior approval of the electorate, and that such approval is necessary.

Were it not for the provisions of subsection (4) of section 3 of the charter, there is little doubt but that the ordinance would be valid. Thus, and preliminarily, it may be noted that the Charter of the City of Los Angeles contains a broad proclamation of powers and rights stating, among other things, that the city "Sec. 2 . . . shall have the right and power, subject to the restrictions in this charter contained: . . . (4) To make and enforce all laws and regulations in respect to municipal affairs, subject only to the restrictions and limitations provided in this charter; . . . (11) Among the rights and powers which may be exercised . . . are the following, . . . (g) to issue bonds for any purpose for which the city is authorized to provide, or for carrying out any of the powers possessed by the city; . . . ."

In the absence of charter restriction, it has been held that compliance with the Revenue Bond Law of 1941 is not required of a city which has availed itself of the provisions of the California Constitution, as amended in 1914, and assumed full control over its municipal affairs. ("In respect to municipal affairs the city is not subject to general law except as the charter may provide." *City of Roseville* v. *Terry* (1958) 158 Cal.App.2d 75, 77 [322 P.2d 44].) Without belaboring the point by extensive quotations therefrom, reference is made to *City of Santa Monica* v. *Grubb* (1966) 245 Cal.App.2d 718 [54 Cal.Rptr. 210] and *City of Redondo Beach* v. *Taxpayers, Property Owners etc. City of Redondo Beach* (1960) 54 Cal.2d 126, 137-138 [5 Cal.Rptr. 10, 352 P.2d 170].

But here, the Charter of the City of Los Angeles specifically declares that the state's general laws establishing the procedure for the creation of bonded indebtedness shall be observed and followed. *Willmon* v. *Powell* (1928) 91 Cal.App. 1 [266 P. 1029] involved the validity of a Los Angeles city ordinance authorizing issuance of revenue bonds constituting a lien on property of the Municipal Housing Commission of that city. The city charter specifically authorized the issuance of such revenue bonds. The court held the ordinance to be valid because of that fact and commented upon charter sub-

section (4) of section 3, as follows (pp. 10-11): "If there were no other provisions covering the subject, the general rule stated in said subdivision (4) of section 3, presumably would furnish the controlling rule for the procedure in the creation of such bonding indebtedness. But in section 251 [specifically dealing with the Municipal Housing Commission] there are the particular provisions . . . which declares that 'the board shall have the right and power' to incur indebtedness by the issuance of bonds in the manner therein stated. . . . It reasonably may be inferred that, in the opinion of the framers of the charter and the people who voted for it, the general laws relating to municipal bonds were not applicable to the plan and purpose of creation of these bonds which were to aid in financing the business entrusted to the housing commission. There appears to be no constitutional restriction upon the right of the city, by its charter, to adopt the procedure which the charter has thus established."

On its face, article I, section 3(4) seems certainly to require application of the state's general laws to creation of the city's bonded indebtedness (with exceptions previously noted) as it states: ". . . at the time *any* bonded indebtedness is created. . . ." (italics added) such laws shall be followed. But petitioner takes issue with this interpretation and urges us to view it otherwise, asserting that the section refers only to general obligation bonds and not to revenue bonds.

First, and perhaps foremost, petitioner invites attention to Charter Amendment No. 6 (Stats. 1947, p. 3540) amending section 3(3) of the city charter. The amendment of subsection (3) reads as follows, in part (first quoting the unamended preamble of section 3):

"Sec. 3. The rights and powers granted by this charter shall be subject to the restrictions set forth in this section, or elsewhere in this charter.

". . . . . . . . . . . . .

"(3) The bonded indebtedness of the City shall not be increased beyond fifteen per cent of the assessed value of all taxable real and personal property within the city. Nothing herein shall limit the power of the City or any board or department thereof to issue bonds payable solely and exclusively out of the revenues of revenue producing utilities or projects owned, controlled or operated by the City for which revenue bonds were issued. . . ."

Emphasizing the word "herein," as used above, petitioner argues that subsections (3) and (4) must be construed

together and that "herein" refers to the charter as a whole, or at least to the whole of section 3, to the end that subsection (3) prevails over the adjuration of subsection (4) that "any bonded indebtedness" must be created only pursuant to the State's general laws. With this we do not agree. The city council submitted this charter amendment (along with other proposed amendments) to the electorate which adopted and ratified it by majority vote in 1947. There was no adoption of any proposal to eliminate section 3(4). To hold that such was accomplished by adoption of amended section 3(3) is illogically devious. Had the electorate wished to divest itself of the right to approve or disapprove revenue bonds, it could have accomplished the same in a straightforward manner by direct vote on the proposition. The admonition of section 3(4) is clear and the language of the court in *City of Roseville* v. *Terry, supra,* is apropos (p. 78): "We do not doubt that the electors, when they approved the charter, understood the language thereof to place in their hands a check upon the issuance of revenue bonds. If that was not the purpose of the language used then it had no purpose." As to Los Angeles, the electorate chose by its charter of 1925 to be protected in bond matters by "the general laws" of the state and there has been demonstrated no desire to divest itself of such protection following adoption of the Revenue Bond Law of 1941 by the state Legislature. We note that section 3 begins with this preamble: "The rights and powers granted by this charter shall be subject to the restrictions set forth in *this* section, *or elsewhere in this charter.*" (Italics added.) This introductory was not amended in 1947, as was subsection (3) thereof. The word "herein," used in section 3(3) quite apparently was not intended to remove restrictions contained in section 3(4). ▮▮ "A system of law which authorizes the electorate to pass upon proposed charter amendments will not permit a court to assume that the voters did not know what they were doing when they voted upon a specific proposal." *City of Los Angeles* v. *Dannenbrink* (1965) 234 Cal.App.2d 642, 655 [44 Cal.Rptr. 624].

It is an undoubtedly sensible rule that in construing a freeholders' charter adopted pursuant to state Constitution article XI, sections 6 and 8, "The charter operates not as a grant of power, but as an instrument of limitation and restriction on the exercise of power over all municipal affairs which the city is assumed to possess; and the enumeration of powers does not constitute an exclusion or limitation. . . . A con-

struction in favor of the exercise of the power and against the existence of any limitation or restriction thereon which is not expressly stated in the charter is clearly indicated. The full exercise of the power is permitted, except as clearly and explicitly curtailed, and in construing a city's charter a restriction on the exercise of municipal power may not be implied." *City of Santa Monica* v. *Grubb, supra,* (p. 724). On reading provisions of the Los Angeles city charter we find not an implied, but a clear and explicit, restriction whereby the state's general law applies (with the departmental exceptions noted) to "any bonded indebtedness" and not as petitioner seemingly declares to "any, except some kinds of bonded indebtedness."

· Petitioner directs our attention to the legislative history of the language employed in the charter, contending such demonstrates that restrictions in the charter were not intended to apply to the issuance of revenue bonds. We are asked further to note that revenue bond financing of municipal improvements was a method unused in California at the time of the charter's adoption. While this may be true, it remains also true that the electorate protected itself as to prospective bond issues by relying upon the general laws adopted, or to be adopted, by the state Legislature, whether for good or for bad. The Legislature did not fail the electorate and required submitting to the electorate's approval the issuance of revenue bonds. "Be that as it may, one thing is certain: for causes which seemed good to the framers of our fundamental law, a barrier against indebtedness by municipal officers and local bodies has been created by the constitution. The door has been locked against all indebtedness of these local bodies, and the key placed in the hands of the electors, who alone can use it, and the judiciary may not arrogate to itself the power to undo what has been thus solemnly done." (*Bradford* v. *City & County of San Francisco* (1896) 112 Cal. 537, 545-546 [44 P. 912].) In the case cited, the court was construing constitutional language but construing a charter invokes the same principles involved in constitutional construction. (*Adams* v. *Wolff* (1948) 84 Cal.App.2d 435, 441-442 [190 P.2d 665].)

█ A pre-eminent prophylactic principle preventing the courts from usurping, in the guise of interpretation, the functions of the electorate and the Legislature, is well stated in the *Adams* case, *supra,* (p. 444) as follows: "It must be remembered that it is not for the courts to pass upon the wisdom or policy of a charter provision. It is our function simply to

interpret it and to determine whether such provision violates a constitutional provision. As was said in *Watson* v. *Division of Motor Vehicles*, 212 Cal. 279, 285 [298 P. 481] : 'the courts have nothing to do with the wisdom, policy, or expediency of the law, for the power to make the law carries with it the power to judge of its necessity, expediency and justice.' This fundamental doctrine has frequently been stated by the courts. . . . Most of the arguments now being advanced by defendants are proper arguments to have advanced to the electors in 1945 and 1946 when this charter provision was before the people, but they are not proper arguments to advance to a court.''

We have thus concluded that the proposed ordinance is invalid, as violative of the Charter of the City of Los Angeles; that the city clerk properly declined to publish it and that his demurrer to the petition must be sustained.

The alternative writ of mandate is discharged and the petition for a peremptory writ is denied.

Files, P. J., and Kingsley, J., concurred.

Petitioner's application for a hearing by the Supreme Court was denied April 9, 1969.